## Commonwealth v. Turner, Appellant.

Argued January 16, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, JONES and COHEN, JJ.

*Edwin P. Rome,* with him *Walter Stein,* for appellant.

*Thomas M. Reed,* Assistant District Attorney, with him *Victor H. Blanc,* District Attorney, and *James N. Lafferty,* First Assistant District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE JONES, June 6, 1957:

The trials of the appellant for murder for the same felonious homicide have amounted to a near tragedy of errors and all because the prosecution was initially conceived and undertaken on confessions wrung from the appellant and his co-defendants by coercive third-degree police methods which served to render the confessions incompetent as evidence.

Five times, the appellant has been convicted by a jury of murder in the first degree. Upon each of the first four convictions, the penalty was fixed at death; at the fifth trial, which is now before us for review, the jury imposed life imprisonment. The court below overruled the defendant's motions in arrest of judgment and for a new trial and entered judgment of sentence on the verdict from which the defendant has appealed.

The first three convictions were also appealed to this court (see 358 Pa. 350, 58 A. 2d 61; 367 Pa. 403, 80 A. 2d 708; and 371 Pa. 417, 88 A. 2d 915) and, each time, a new trial was ordered except that, upon the first appeal, the new trial did not eventuate until the case had been carried to the Supreme Court of the United States. There, our earlier judgment of affirmance was reversed on the ground that the defendant's confession, which had been introduced in evidence over his objection, had been coercively extracted from him while he was being held incommunicado by the investigating police officers: see 338 U. S. 62. The fourth conviction was not appealed. The trial court set aside the verdict and granted a new trial because of patently prejudicial trial error: see 1 D. & C. 2d 11.

The facts of the killing for which the defendant was indicted fully appear in the opinion for this court on the first appeal: see 358 Pa. 350, 351, et seq., and need not be reiterated here in detail. For present purposes, it is sufficient to relate that about 5 P.M. Saturday afternoon, December 15, 1945, the brutally beaten bodies of two men, Charles Simmons and Frank Endres, owner and employee, respectively, of the Ace Broom Factory, located on North Second Street in Philadelphia, were found lying in pools of blood on the floor of the factory. Both men were unconscious and neither ever regained consciousness before dying as a

result of his wounds. The only witnesses of the crime were its perpetrators and its victims.

The police interrogated many suspects and approximately five months later, viz., May 19, 1946, they took into custody one Clarence Lofton "relative to another murder" and not in connection with the broom factory killings. On June 3, 1946, Aaron Turner, the present appellant, was taken into custody around noontime by two Philadelphia detectives; and about 3 P.M. the same day the detectives arrested Jasper Johnson. Turner and Johnson along with Lofton were then detained by the police incommunicado until June 12, 1946, when they were delivered to the county prison.

On June 8, 1946, written confessions were obtained from Turner, Johnson and Lofton, each signing his own confession as well as the confessions of the other two. At Turner's first trial, the Commonwealth offered in evidence against him the confessions of all three accused. It is unnecessary here to restate the invalidating circumstances under which the confessions were obtained. Upon a review of Turner's first conviction, on certiorari to our judgment of affirmance, the Supreme Court of the United States held that the pertinent considerations left "open no other possible conclusion than that . . . [Turner's] confession was obtained under circumstances which made its use at the trial a denial of due process" and that "the same considerations that bar admission of the confession by Turner made over his own name extend to his contemporaneous adoption of the Johnson and Lofton confessions": see 338 U. S. 62, 65.

As the confessions had constituted substantially the Commonwealth's entire case against the defendant at his first trial and with their exclusion upon a retrial thus foreordained by the Supreme Court's ruling, the Commonwealth was put to it to introduce other evi-

dence to support the indictment. The fact is that the prosecution's subsequent efforts to meet the exigency of proof, thus occasioned, has been productive of reversible error at each succeeding retrial that has come before us for review. For a proper understanding of the background of the appellant's present complaint, reference to the subsequent trials and appeals is essential in order that the continuity of the pervading error may become the more apparent.

At the second trial the Commonwealth, deprived of the confessions, offered in evidence admissions made by Turner at a preliminary hearing before a magistrate on June 8th which was the fifth day of his vitiating detention and prior to signing of the confessions. The magistrate's hearing was held in the same building in which the suspects were being detained and constituted but a very brief interlude in the persistent police questioning to which Turner, Johnson and Lofton were subjected. In holding that this evidence was inadmissible, Mr. Chief Justice DREW said for this court,—"Turner's signed written confession has been deemed the result of inherent coercion. Certainly statements or admissions which he made at the preliminary hearing held during the coercive period and prior to his execution of the condemned confession must be considered tainted by the same infirmity. It is evident that the United States Supreme Court did not regard the interlude of the preliminary hearing as having purged the coercion. We are constrained to hold, therefore, that the testimony taken at the magistrate's hearing was inadmissible as evidence against Turner as was his confession:" 367 Pa. 403, 407.

The foregoing was the principal ground for our reversal of the judgment of sentence although additional error was also noted in the trial court's failure to submit to the jury second degree murder as a possible ver-

dict and in the court's refusal to charge, upon specific request, that the testimony of Lofton, then a witness for the Commonwealth, was to be carefully scrutinized. Lofton, at his trial, had entered a plea of guilty to the charge of murder and had received a life sentence. But, the crucial error so far as substantive evidence in support of the verdict was concerned was the objectionable testimony derived from the magistrate's hearing.

The appellant had also assigned for error the trial court's refusal of his request that the Commonwealth's witnesses be excluded from the courtroom when not actually testifying. The importance of such a precaution became all too evident a little later when the two detectives, who had originally arrested Turner and had been present at, and had participated in, the June 3rd to 12th, 1946, interrogations of Turner, Johnson and Lofton, surprisingly gave incriminating testimony against Turner which they had never before disclosed to their superiors and specifically had not mentioned when testifying at the first trial. But, inasmuch as a new trial was being ordered because of the error already referred to, no mention was made in the opinion for this court with reference to the assignment of error based on the court's refusal to sequester the Commonwealth's witnesses.

With Turner's confession and, likewise, his admissions and statements at the magistrate's hearing thus effectually eliminated from the case, the Commonwealth at the third trial called Lofton as a witness and again introduced the testimony of the two police detectives which they had given for the first time at Turner's second trial and which, notably, was not until after the priorly all-important confession had been definitely excluded as evidence. The detectives' belatedly divulged testimony, which was designed to tie Turner to the actual commission of the homicides, con-

sisted of what the two detectives said they had eaves-dropped on June 6, 1946, from where they were secreted near a cell in which the three suspects (Turner, Johnson and Lofton) were allegedly then being held. What the detectives purportedly overheard is related in the opinion for this court on Turner's appeal (see 371 Pa. 417, 421) when the trial court's refusal to sequester the Commonwealth's witnesses upon request of defendant's counsel became the chief error for which we again reversed and ordered a new trial.

At the fourth trial Lofton refused to testify for the Commonwealth and responded to the district attorney's interrogations as follows: "Just a minute, Chief. When you was up [at the Eastern State Penitentiary] last week I told you I had been tried and convicted and I preferred to have no more to say or do with the case. I am doing my time; I am doing life. There is nothing else that I can say in no way, shape or form." An extended colloquy between the witness and the court and district attorney ensued following which the district attorney moved for permission to read to the jury portions of Lofton's testimony at Turner's third trial together with the cross-examination. (As already noted, Lofton had not been called to testify at Turner's first trial.) The district attorney made this motion on the mistaken theory that Lofton, "having refused from the very beginning to testify at all", had thus rendered himself "an unavailable witness." The trial judge granted the motion over the objection of defendant's counsel. The case went to the jury and resulted in a verdict of guilty with sentence fixed at death. In disposing of the defendant's motion for a new trial, the court en banc erroneously approved the reading in evidence of Lofton's former testimony but did grant a new trial because of the prejudicial effect of a statement made by the district attorney within the hearing of the

jury referring to the defendant's three previous convictions for the same offense: see 1 D. & C. 2d 11, 16.

After the fourth trial but prior to argument of the motion for a new trial, defendant's counsel received a request from Lofton in the Eastern State Penitentiary seeking an interview. Counsel immediately apprised the trial judge of Lofton's communication and, with the court's approval, visited him in confinement. On that occasion Lofton repudiated entirely all of the testimony that he had ever given against Turner. His recantation was at once reduced to writing and was signed by him in the presence of prison officials. He moreover swore to its truth before a prison official who thereupon notarized it. This affidavit was filed with the court as an additional reason for the granting of a new trial since the Commonwealth's principal witness against Turner had now admitted having perjured himself in everything he had ever theretofore testified to against him. A copy of the affidavit was submitted to the trial judge and to the district attorney. The effect of Lofton's recantation was urged upon the court en banc on the argument of the defendant's motion for a new trial, but the court did not, in its opinion granting a new trial for another reason, touch upon the significance of the affidavit.

In preparation for the impending fifth trial, Lofton was again visited at the Eastern State Penitentiary by defendant's counsel who promptly apprised the district attorney of that fact and at the same time informed him that Lofton persisted in his repudiation of his former testimony against Turner and would refuse to testify against him at the oncoming trial. After defendant's counsel and the district attorney had thus discussed Lofton's reaffirmed attitude, the district attorney made a trip to the penitentiary to interview him. Lofton confirmed to the district attorney that his af-

fidavit recanting his former testimony was the truth and that he would not testify against Turner, as the district attorney pressed him to do. Nonetheless, at the subsequent trial, the district attorney called Lofton as a witness for the Commonwealth and, as had been plainly forecast, the witness steadfastly refused to testify as the district attorney strove, by interminable and repetitious questioning, to get him to do in line with his earlier testimony. For his refusal to answer the district attorney's questions, the trial judge forthwith held Lofton in contempt of court. The district attorney then argued that Lofton, by his refusal to testify, had rendered himself an unavailable witness and that, therefore, his former testimony against the defendant should be read into the record, and moved the court for leave so to do.

It is, of course, too evident to admit of any doubt that the district attorney well knew when he called Lofton as a Commonwealth witness at Turner's fifth trial that he would refuse to testify to the same effect as he formerly had. Not only had the district attorney been so advised right up to the moment of his again calling Lofton as a witness but he was, moreover, the same district attorney who had appeared for the Commonwealth at Turner's fourth trial where he had witnessed Lofton's immovable refusal to testify against Turner. What, then, was the district attorney's motive in again calling Lofton? The answer is not hard to discern. In the impasse created at the fourth trial by Lofton's refusal to testify, the learned trial judge, on the district attorney's motion, had erroneously permitted him to read in evidence Lofton's former testimony against Turner on the ground that he had become an unavailable witness. It was that very procedural achievement at the fourth trial that inspired the district attorney to go ahead and again call Lofton.

The record makes it abundantly clear that the district attorney expected or at least hoped to be permitted, in keeping with the trial court's ruling at the fourth trial, to read in evidence Lofton's former testimony as that of an unavailable witness. Thus, in arguing to the trial judge for the right so to proceed at the fifth trial, the district attorney said, "I now insist, if the Court please, that you rule on my motion to consider this witness, as was formerly done, an unavailable witness. The pattern is precisely the same as it was at that time. . . . I would say this, Your Honor, that the Court en banc [on the fourth trial's after-verdict motions] having the same pattern before it at the phase of the case where the Commonwealth made a similar motion, decided that that was proper. . . . That is the gist of my argument, if the Court please, to refer the Court to the opinion of the Court en banc in the prior Turner trial, as a basis of my contention of the motion made."

Obviously, Lofton was not an unavailable witness either within the letter or the spirit of the Act of May 23, 1887, P. L. 158. Not only was he then present in the courtroom but was actually on the witness stand at the time. Nor had he refused to testify to what he then avowed to be the truth. The fact is that he was willing to testify in accordance with his recantation. The matter of his affidavit having in the course of the colloquy between the court and counsel become known to the trial judge (who was trying the case for his first time), the court stated, "This man has been called as a witness. He says that this paper is the truth and he says he wants to tell the truth. In other words, he wants to testify to those facts." Such being the witness's status, the court very properly refused the district attorney's motion to read Lofton's former testimony in evidence as that of *an unavailable witness.*

Thereupon, the district attorney himself introduced in evidence Lofton's recantation affidavit by interrogating him on direct examination in regard thereto as follows: "Q. . . . . You signed it and you swore it was the truth; is that right? A. I did. Q. And you still maintain that that is the truth; is that right? A. I do. Q. Now I will read you what you said in that Affidavit:

" 'I, Clarence Lofton, made the following statement freely and voluntarily without any threats or promises made to me.

" 'Although I have testified against Aaron Turner and Jasper Johnson and have said that they took part with me in the robbery of the Ace Broom Factory at 355 North Second Street, Philadelphia, Pennsylvania, which led to the killing of two men named Charles Simmons and Frank Endres, everything I have ever said which connects these two men in any way with that crime is untrue. So far as I know, neither Jasper Johnson nor Aaron Turner had anything to do with that crime. Moreover, even though I pleaded guilty to participating in that crime, I never had anything to do with it either.' Now, do you say that is true? A. I do."

At that point the district attorney, addressing the court, said,—"At this time, if the Court please, I ask for leave to cross examine this witness. This witness has shown himself to be a hostile and antagonistic witness, and I ask for leave to cross examine him." Defendant's counsel at once objected to the district attorney's request and, after extended argument by respective counsel, the following took place:

"Mr. Panati [the district attorney]: . . . . And I think, Your Honor, I need say nothing further as to whether or not this witness has now said something which is hostile. He now says that everything he said

about this defendant and Jasper Johnson, the other accomplice, and himself was a lie. If that isn't hostile and adverse, I have never heard of anything.

"The Witness [Lofton] : Mr. Panati, would I ask this?

"Mr. Panati : I object to any spontaneous remarks from this witness.

"The Court : Just sit down, Mr. Lofton.

"The Court desires to ask you one question, Mr. Panati. Do I understand you are surprised at the testimony?

"Mr. Panati : That is precisely the Commonwealth's position.

"The Court : And you plead surprise?

"Mr. Panati : I do, sir.

"The Court : The objection is overruled. Exception noted for the defendant."

While it is of relatively minor present significance, it will not be unnoticed that, whereas the district attorney had sought leave to cross-examine his own witness on the ground that he had shown himself hostile and antagonistic, the court's interrogation caused the district attorney to change his ground and plead "surprise". Compare *Selden v. Metropolitan Life Insurance Company,* 157 Pa. Superior Ct. 500, 510, 43 A. 2d 571. In any event, neither situation was present. There was no rational basis for asserting that the witness had proven hostile and antagonistic when all he had done was to testify as the district attorney well knew in advance he would do, namely, that his recantation affidavit spoke the truth. To accept the district attorney's contention that Lofton's hostility and adverseness was evidenced by his refusal to testify against Turner, as he had done at former trials, would be to put the Commonwealth in the position of seeking a victim regardless of the truth or falsity of the evidence elicited to

sustain the charge. At the same time, for the court to accredit "surprise" to the district attorney in the undisputed attending circumstances was to accept pretense for reality and make a sham of the requisite for the exercise of the privilege of cross-examining one's own witness. What the district attorney intentionally and deliberately did was to set the stage for his request to cross-examine Lofton in order to get before the jury contradictory prior statements of the witness helpful to the prosecution. And, that is never permissible. Moreover, the trial court erroneously overruled the defendant's proper request that the district attorney be required to state of record the antecedent conflicting statement of the witness upon which he had relied and whereby he was "taken unawares" at trial. See *Selden v. Metropolitan Life Insurance Company,* supra, at p. 505.

The proper conception of the purpose and intent of the rule allowing for impeachment of one's own witness was well expressed by Circuit (now Chief) Judge HUTCHESON of the Court of Appeals for the Fifth Circuit in *Young v. United States,* 97 F. 2d 200, 205, where a first degree murder conviction was reversed because of trial tactics on the part of the district attorney precisely similar to those employed in the instant case. Thus, the learned jurist said, ". . . it is fundamental . . . that the party offering the witness be really surprised at his testimony." *Young v. United States,* supra, is the subject of an annotation in 117 A.L.R. 316 wherein it is stated (p. 327) that "Generally, to entitle the party calling the witness to relief from the situation caused by the witness's adverse testimony, it is essential that such party be really surprised by such testimony [citing cases]." Surprise, in its legal connotation, does not embrace disappointment or a feeling of frustration on the part of the one seeking to have a

witness testify otherwise than he has indicated he will do.

But, even if the district attorney was actually surprised at Lofton's repudiation of his former testimony against Turner, the witness had said nothing harmful to the Commonwealth up to the time the district attorney plead surprise. The circumstances did not, therefore, justify the court's granting the district attorney's plea. The evidentiary situation requisite for such a plea, even where there is *real* surprise, was well set forth by Judge (now Mr. Justice) ARNOLD in *Selden v. Metropolitan Life Insurance Company,* supra, at p. 508, as follows, "Since the purpose of the cross-examination and impeachment is, then, to induce the jury to *disbelieve* the testimony of the witness—there must be something in the witness' testimony, which, if not disbelieved by the jury will be hurtful or injurious to the party calling him. Were it otherwise there could be no occasion to discredit or impeach the witness or to stamp him as unworthy of belief."

In *Fisher v. Hart,* 149 Pa. 232, 235, 24 A. 225, a witness for the plaintiff was asked by counsel in direct examination whether the defendant had superintended the construction of a scaffold. The witness answered, "I don't remember" whereupon counsel asked him "Did you not tell me so yesterday?" to which the witness replied, "I don't remember." This court held that the witness had not testified to anything prejudicial to the plaintiff and that, consequently, the trial court erred in permitting plaintiff's counsel to cross-examine him. In the instant case, all that Lofton had sworn to up to the time of the district attorney's plea of surprise was "So far as I know, neither Jasper Johnson nor Aaron Turner had anything to do with [the Broom Factory] crime." At most, it was a mere disclaimer of any

knowledge that Turner had participated in the homicide charged.

Upon the trial court's allowance of the plea of "surprise", the district attorney proceeded to cross-examine Lofton with respect to testimony he had given at his own trial on January 31, 1947, following his plea of guilty. The witness again plainly indicated that he was unwilling to answer any questions except those pertaining to his recantation affidavit whereupon the following colloquy between the court and the witness took place:

"The Court: Well, we have already held you in contempt.

"The Witness: Yes, sir.

"The Court: For failure to answer the questions that were directed to you. We direct you again to answer the questions.

"The Witness: Yes, sir. Your Honor, I will admit I was held in contempt before.

"Mr. Rome [defendant's counsel]: Sir, on behalf of the defense I would object to Your Honor's holding this witness in contempt in this fashion at this time [i.e., in the presence of the jury and while the witness was on the stand].

"The Court: Well, that objection is overruled.

"Mr. Rome: Exception, sir.

"The Court: We hold the witness in contempt of Court for failure to answer the questions."

The district attorney then began reading into the record from the transcript of Lofton's testimony at his trial seven years before wherein he had implicated Turner as an active participant in the commission of the felonious homicide for which Turner was presently on trial. While Lofton stolidly remained mute upon interrogation as to the correctness of the questions and answers, the district attorney read from the transcript

without further interruption to the extent of what constitutes six and one-half pages of the present printed record at the conclusion whereof he asked the witness, "Now then, those questions were asked, were they not, and the answers as I read them were the answers you made?" and the witness responded, "No, I didn't make them. Otherwise I will tell you why I didn't make them." After more reading from the testimony without reply from the witness as to whether he had so testified, the following interrogation concluded the cross-examination: "Q. [by the district attorney] When you were testifying in court did you answer the questions, the way I have read the answers? A. [by the witness] I don't know. I might have. Q. You might have. Was it the truth? A. No it wasn't."

Although the trial judge was careful to instruct the jury that Lofton's former testimony was not to be taken as proof of any substantive fact against Turner but was read merely for the purpose of affecting Lofton's credibility in respect of his present denial of any knowledge that Turner had had anything to do with the crime, the harm to the defendant from the cross-examination which the trial judge had thus permitted the district attorney to employ for the ostensible purpose of impeaching Lofton's credibility is all too evident. It is wholly unrealistic to pretend that the jury was capable of eradicating from their minds Lofton's former testimony except for its effect in currently impeaching him. Even if the jurors tried ever so conscientiously to so limit the effect of the witness's prior testimony and concluded that, by reason thereof, he was not presently worthy of belief, the resultant psychological effect would be to cause the jury to deduce that what Lofton had first testified to was the truth. The harm to the defendant from the improper cross-examination is as manifest as the error of the trial

judge in allowing the district attorney to so proceed is palpable.

In *Fisher v. Hart,* supra, this court condemned the trial court's action in permitting counsel to cross-examine his own witness in order to put "in the mouth of the witness the very allegations of fact which [counsel] wished him to verify by an affirmative answer." Likewise in *Young v. United States,* supra, it was deemed fundamental "that the impeaching testimony be admitted not for the purpose of supplying what the witness was expected to, but did not, say, as a basis for a verdict . . .", and, further, that it is "never admissible under any sound interpretation of the rule [allowing for impeachment of one's own witness] . . . to offer a witness whose testimony the offerer knows in advance will be adverse, in order to get before the jury, in the form of impeachment, contradictory statements of his which are useful to the prosecutor." The rule has long been recognized and respected by this court. *Stearns v. The Merchants' Bank,* 53 Pa. 490, 493, quoted with approval the head note of *Smith v. Price,* 8 Watts 447, 448, to the effect that "a party cannot, after examining a witness give in evidence his former testimony and declarations, ostensibly to discredit him, but in truth to operate as independent evidence." The opinion in *Smith v. Price,* supra, was a *per curiam* which *Stearns v. The Merchants' Bank* identified as being "in the strong, nervous language which characterized C. J. Gibson" who had denounced the stratagem by declaring that " 'This was a very ingenious device, but it must not succeed.' " In *Commonwealth v. Wickett,* 20 Pa. Superior Ct. 350, 355, President Judge RICE interpreted *Smith v. Price,* supra, to mean that "The device of calling a witness whom the party is not compelled to call for the purpose of getting before the jury his contradictory statements made on other occasions cannot be

allowed to succeed." The ruling has never since been relaxed (*Commonwealth v. Nowalk,* 160 Pa. Superior Ct. 88, 94, 50 A. 2d 115) but continues to endure in full vigor and should, therefore, have been faithfully enforced by the trial court.

Thus, basic and crucial error obviously permeated the defendant's trial. His conviction cannot therefore be permitted to stand; and a new trial is accordingly indicated. However, a retrial will prove to be a vain and oppressive formality if the Commonwealth is not able to offer more substantial proof linking the defendant to the crime charged than what it adduced at the trial now under review which was legally insufficient to sustain a conviction under the indictment. As Mr. Justice CHIDSEY expressly recognized in *Commonwealth v. Turner,* 371 Pa. 417, 431, 88 A. 2d 915, "Lofton's testimony was necessary for a conviction." And, definitely, Lofton did not testify against Turner at the trial now before us. The admission of his testimony from his own trial, which the district attorney read into the record, was for the limited purpose of impeaching his recantation affidavit which the district attorney himself had put in evidence through his direct examination of Lofton.

All that was left of substantive evidence in any way connecting Turner with the crime charged in the indictment was the testimony of the two detective witnesses, O'Mahoney and Thompson, as to what they had allegedly overheard Turner say in answer to a query from Johnson when he, Turner and Lofton were confined in a cell in City Hall next to which O'Mahoney and Thompson were secreted in another cell.[1] The testimony of the detectives in the immediate connection

---

[1] Turner, Johnson and Lofton each separately denied at various trials that the three of them were ever in a cell together while they were being held by the police in City Hall.

was inherently so lacking in probative value as to be incapable of supporting a verdict which would deprive the defendant of either his life or liberty. If for no other reason, its integrity is seriously impugned by the anachronous circumstances of its belated narration as well as by attendant discrepancies.

O'Mahoney and Thompson were the detectives who, on June 3, 1946, had taken Turner and Johnson into custody on suspicion in connection with the broom factory homicides and thereafter, in relays with other police officers, had questioned these suspects intermittently by day and by night from June 3rd until the evening of June 7th when they were said to have "confessed". O'Mahoney and Thompson had each testified fully at Turner's first trial in September, 1946; in fact, the confessions of all three indictees—Turner, Johnson and Lofton—were identified and read in evidence against Turner at his first trial by none other than the witness O'Mahoney. Yet, neither he nor Thompson mentioned anything about having overheard a conversation between Turner and Johnson in a cell in City Hall on June 6, 1946, while the prisoners were under restraint by the police. Furthermore, neither O'Mahoney nor Thompson testified to any such conversation at Johnson's first trial on January 28th and 29th, 1947, or at Lofton's trial two days later (viz., January 31st, 1947). The chronology of the subsequent testimonial situation in this connection is especially illuminating.

The decision of the Supreme Court of the United States reversing Turner's first conviction and invalidating the confessions as evidence was handed down on June 27, 1949. Three months later, viz., on September 24, 1949, Turner was again brought to trial. It was then that O'Mahoney and Thompson, when called as witnesses at the second trial, related *for the first time* the purported conversation between Johnson and

Turner in a cell in City Hall which the witnesses claimed to have overheard on June 6, 1946, more than three years before they disclosed it and which O'Mahoney then paraphrased. But, at the fifth trial, which is now before us, both testified to having heard a voice, which they recognized as Johnson's, querying as follows: "Why are the detectives asking us about that broom place, Tree ["Treetop" being Turner's nickname]?" And, another voice, which they identified as Turner's saying—"I had to hit the second man pretty hard twice, the blood came out his ears." This, they remembered although they had made no record or memorandum of it and as to most everything else were vague and indefinite.

The testimony of O'Mahoney and Thompson over the various trials at which they have repeated their story concerning what they had allegedly overheard when secreted in the cell on June 6th was in many respects confused, uncertain and conflicting, e.g., as to who, if anyone, had ordered them to put the suspects in one cell for the purpose of listening for self-incriminations or as to the precise time of day and period the witnesses had remained hidden in the cell or as to who had actually placed the several suspects in the adjoining cell. In particular, the discrepancies between the different versions given at the various Turner trials by O'Mahoney (Thompson appears to have played a secondary testimonial role) are nothing less than glaring. For example, at the second Turner trial, O'Mahoney testified that he had not discussed the overheard conversation, which he was then relating in court for the first time, with anyone except Thompson and Turner; and he testified to like effect at Turner's fourth trial. But, at the fifth trial, O'Mahoney testified that he had made an oral report to Sgt. Riccardi of the Homicide Squad of what he had overheard in the cell. After

saying in that connection "The exact words I told him I can't remember", a moment later he testified, "I told him exactly what I had overheard, if I told him that thing." This patent and serious departure by O'Mahoney from his testimony, twice related at former trials, was left unexplained. It so happens, however, that Sgt. Riccardi testified at Turner's third trial that he "did not receive any report [concerning the conversation O'Mahoney had allegedly overheard] because from what had developed, we did not need it." At the very time O'Mahoney was thus enlarging his prior testimony, Sgt. Riccardi was sitting in the court room but was not called to the stand by the Commonwealth. The reason why is not hard to fathom. Had Riccardi testified at the fifth trial as he did at the third trial in above relation, his testimony would have directly impeached O'Mahoney's credibility.

And, it is more than difficult to understand why, although O'Mahoney and Thompson actively participated throughout in the police interrogation of Turner, Johnson and Lofton and had deliberately secreted themselves in the adjoining cell for the very purpose of obtaining, if possible, some incriminating information from one or more of the three suspects, they never made a written report to anyone of what they claimed to have thus heard. Indeed, O'Mahoney confirmed at Johnson's second trial that he had not made a written report of what Turner was supposed to have said because he did not think it important enough. Was it not important that the other police officers be informed of what Turner and Johnson were supposed to have said in the cell on June 6th when the police interrogation of them was continued beyond that date and the broom factory murders were the burden of the questioning of the three suspects? None of the investigating officers who testified at Turner's first trial (i.e., before the

eavesdropping episode had been brought into the case) deposed otherwise than that Turner had at all times maintained his innocence down to the evening of June 7th.

O'Mahoney and Thompson still further impaired their credibility by their contumacious conduct during the trial now under review. At the outset, counsel for the defendant moved the court for the sequestration and exclusion from the court room of the Commonwealth's witnesses except when testifying—a right which we had expressly accorded the defendant by our decision in *Commonwealth v. Turner,* 371 Pa. 417, 426-429. There, Mr. Justice CHIDSEY, who spoke for the court, after recognizing that "the credibility of the two detectives was a matter of very great, if not paramount importance", said that "We can conceive of no case more appropriate or compelling for the sequestration of witnesses than that under the facts and circumstances here presented." In the present instance, the trial judge, of course, at once granted the defendant's motion and, in so doing, stated in open court,—"We will sustain the motion. We will direct that all witnesses be segregated and that they be kept out of the court room except when testifying. And we also instruct all witnesses that they are not to discuss this case among themselves or with any other witness at any time during the continuance of this trial." After brief remarks by respective counsel of their satisfaction with the ruling, the court ordered all witnesses to stand and then added,—"If there is any witness who didn't understand the Court's instruction, please let us know now. All right. All you witnesses remove yourselves from the courtroom and don't come back until you are called."

The taking of testimony was then begun. Three witnesses for the Commonwealth (viz., the widows of the victims of the homicides and the coroner's physi-

cian) were called and examined up to the time of the noon recess. During the recess defendant's counsel went to a restaurant a short block from City Hall where he happened upon O'Mahoney and Thompson sitting together at a table for two located in the back of the restaurant behind a large column or pillar. Their actions plainly indicated that they had been taken unawares. Counsel brought the occurrence to the attention of the trial judge immediately upon resumption of the court session following the recess and, outside the hearing of the jury, the following took place. The court called before it the two detectives who were then examined by defendant's counsel in relevant connection. Each admitted he had been in court when the court ordered the witnesses for the Commonwealth to be segregated and heard the court's caution to the witnesses not to talk with each other about the case. O'Mahoney told the court how he had gone to the back of the restaurant and there sat at a table for two at which Thompson was already seated. The detectives' consciousness of having violated the court's instructions was evidenced by a trifling but nonetheless compelling incident. Defendant's counsel, who had been facing Thompson, walked over to the detectives' table and, from behind, placed his hand on O'Mahoney's shoulder to make certain that he, too, knew of counsel's presence. In turning around to face defendant's counsel, O'Mahoney held his paper napkin up to his face as if to disguise himself, as he expressed it. He explained to the court that he had been merely clowning. But, even so, his pantomime was the instinctive reaction of a guilty conscience.

Counsel for the defendant promptly moved the court to exclude the two offending detectives from appearing as witnesses for the Commonwealth because of their violation of the court's sequestration order for which

action there is respectable authority: see VI Wigmore on Evidence (3rd Ed., 1940), §1842, p. 365 et seq. However, both detectives avowed that they had not discussed the case while they were together during the trial recess, and the court accepted their assertion to that effect and overruled the defendant's motion, thus permitting O'Mahoney and Thompson to testify against Turner. The appellant accordingly assigns this action of the court for error. It is presently unnecessary to consider the appellant's contention in such regard, and we expressly refrain from so doing. Rather, we shall assume, arguendo, that the trial court was not guilty of an abuse of discretion in allowing the detectives to testify despite their manifest breach of the court's sequestration order and caution. Nevertheless, the witnesses' disobedience is to be considered as affecting their credibility. See 53 Am. Jur., Trial, §33, p. 48. Nor is the impairment of the witness's probity by reason of his contumacy lessened to any degree because his deliberate disobedience was professedly not utilized to accomplish what the order sequestering him as a witness was designed to obviate. If the rule were otherwise, "the expedient of sequestration" which, as Wigmore expresses it (Vol. VI, (3rd Ed., 1940) §1838, p. 352), "is (next to cross-examination) one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice" would for all practical purposes, become a hollow form.

The point which we have sought to develop up to now is not that the testimony of O'Mahoney and Thompson concerning the alleged conversation between Johnson and Turner in the cell in City Hall on June 6th is so unworthy of belief as to be rejected as a matter of law but that it is inherently so unreliable as not to justify a finding beyond a reasonable doubt that the

conversation did actually occur as O'Mahoney and Thompson have testified.

We come then to the final and most important consideration of all. Assuming, for present purposes, that Johnson and Turner, when in the cell on June 6th, said exactly what O'Mahoney and Thompson attribute to them, still the words lack the specification necessary to constitute them a definite and complete admission of guilt of a particular homicide committed at a particular place. An oral confession based on the words, understanding and memory of an auditor, especially an eavesdropper, are " 'the weakest and most suspicious kind of evidence' ": see *Commonwealth v. Giovanetti*, 341 Pa. 345, 362-363, 19 A. 2d 119, quoting with approval from III Wigmore on Evidence, (3rd Ed., 1940) §866, pp. 356, 358. As there pointed out by way of quotation from Mr. Justice FOSTER, " 'words are often misreported—whether through ignorance, inattention, or malice, it mattereth not to the defendant, he is equally affected in either case; and they are extremely liable to misconstruction; and withal, this evidence is not in the ordinary course of things to be disproved by that sort of negative evidence by which the proof of plain facts may be and often is confronted.' " Such, indeed, is the situation which confronts Turner. All that is possibly available to him in refutation of the detectives' story is his own denial in which he has steadfastly persisted.

To be of independent probative value, an alleged oral confession or admission of guilt should be complete in itself if it is to establish the facts for which it is offered. It is not to be implemented by suspicion or conjecture or by piling inference upon inference. In the present instance, with no further identification than "that broom place" in Johnson's query, the Commonwealth would have the jury doubly infer that he was referring to the Ace Broom Factory and that

Turner so understood him.[2]  With the *locus delicti* and Turner's understanding thus inferentially established, the Commonwealth would have the jury further infer that "the second man" referred to in Turner's statement that he "had to hit . . . pretty hard twice" was one of the two men found mortally wounded on the floor of the Ace Broom Factory.  The statements attributed to Johnson and Turner were not so conclusive in their import as to warrant a finding by the jury beyond a reasonable doubt that they constituted an admission by Turner that he was guilty of the killing of Endres whose death was the subject of the indictment upon which he was tried.

Were it not for the idea of the defendant's guilt, which the written confessions in this case originally created, but which those confessions (since completely invalidated) are no longer capable of establishing, it is inconceivable that the conversation between Johnson and Turner, which the detectives claim to have overheard, would ever have been deemed by anyone as constituting a conclusive admission by the defendant of his guilt of the murder which, except for the invalid confessions, he has at all times denied and which the Commonwealth, to date, has failed to prove by legally competent evidence.  It is, of course, the bounden duty of peace officers to ferret out crime and prosecute offenders vigorously, and it is likewise the duty of the courts to enforce the law faithfully and fairly.  But, verdicts of guilty are not to be obtained nor penalties inflicted on evidence incapable of proving the accused's guilt beyond a reasonable doubt.  The evidence in this

---

[2] At Turner's second trial, which was the first time O'Mahoney had testified to the alleged conversation in the cell, he had Johnson (or Lofton) saying, "Hey, 'Tree' what do you think about them detectives asking us all them questions" without any reference whatsoever to the "broom place".

case was patently far from sufficient to justify the jury's verdict.

The judgment of sentence is reversed and a new trial granted with directions that, if the Commonwealth is not able to produce evidence of defendant's guilt by testimony of any greater legal sufficiency than what it offered at the trial here involved, a *nolle prosequi* be entered on the indictment.

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE BELL:

On December 15, 1945, the brutally beaten bodies of two men, Charles Simmons, owner of the Ace Broom Factory, and Frank Endres, his employee, were found lying in pools of blood on the floor of the Ace Broom Factory on North 2nd Street, Philadelphia. Both died of their wounds without regaining consciousness. The murders occurred in the perpetration of a robbery.

Turner, one of the three self-confessed murderers, has been convicted five times of murder in the first degree—four times with sentence of death, the present time with life imprisonment. Turner, after each conviction, was granted a new trial because of trial errors.

Never before—until today—has this Court or any Court held that the Commonwealth's evidence was insufficient—or even intimated that it might be insufficient—to make out a prima facie case of murder of the first degree. Today, for the first time, the majority declares that the Commonwealth's evidence in this trial *was not legally sufficient to prove defendant guilty* beyond a reasonable doubt *of murder or of any crime whatsoever.*

The majority's present conclusion is to me incomprehensible, but equally startling and incomprehensible is the method by which it arrives at this conclusion.

Lofton had pleaded guilty to murder, but was sentenced only to life imprisonment because he was the look-out. When Turner was taken to the scene of the homicides, and his two confederates, Johnson and Lofton, reenacted the murders of Simmons and Endres, in the commission of which crimes they assigned Turner the major role, he made no denial of their accusations but stood mute. Lofton testified against and implicated Turner in his second and third trials but now [*] repudiates his written confession and his oral confession, and his former testimony, and even his own plea of guilty under which he has served 10 years of his sentence of life imprisonment. Turner repudiated his written and oral confessions of guilt; and his prior written confession of guilt was held inadmissible by the Supreme Court of the United States in *Turner v. Pennsylvania*, 338 U.S. 62, and his oral admission of guilt was held inadmissible by this Court in *Commonwealth v. Turner*, 371 Pa. 417, 88 A. 2d 915, because (in each of those cases) his written and oral confessions of guilt were made as a result of interrogation by the police which amounted to coercion and a denial of due process. Even if it be assumed that the Commonwealth's substantive evidence to *connect* Turner with the brutal murder of Simmons and Endres consisted only of the testimony of two detective witnesses, O'Mahoney and Thompson, it is *amply sufficient,* under a myriad prior decisions of this Court, to justify a finding of guilty of first degree murder.

Turner was arrested with one Jasper Johnson on June 3, 1946. This Court in *Commonwealth v. Turner,* 371 Pa., supra, said (page 421) : ". . . in order to connect him with the commission of the crime, the Com-

---

[*] This is merely in accord with the code of the underworld not to "rat" on each other.

monwealth relied upon the testimony of Lofton and that of two police detectives, Thompson and O'Mahoney, who testified that on June 6, 1946 they had secreted themselves in a cell adjoining that occupied by Turner, Johnson and Lofton and overheard the three men talking. Thompson testified, 'Turner said he had a hell of a time with the second man. He hit him pretty hard twice and blood came out of his ears.' O'Mahoney's testimony is as follows: 'A. The voice I heard sounded like Jasper Johnson's voice. He said "Hey, Tree, [Turner's nickname was "Treetop"] why are the detectives asking all them questions?" There was reference made to something about a broom factory. The answer came back "I had to hit the second fellow— Q. Who said that? A. This defendant, Aaron Turner. Q. What did he say? A. He said "I had to hit the second fellow awfully hard twice and the blood came out of his ears." ' " The detectives gave this same testimony in the present trial and that testimony was clear, positive and unshaken. All of the other testimony of the detectives at that trial and at the present trial was clear and in all material respects * consistent. Moreover, Turner took the witness stand at this (present) trial, but his testimony was so full of evasions and "don't remembers" that it is very easy to understand why the jury did not "swallow" it.

This Court held in *Commonwealth v. Turner,* 371 Pa., supra, that the testimony of these detectives was constitutionally and properly admissible and that the credibility of this evidence was for the jury—exactly contrary to what the majority opinion now asserts. We there also said (page 426): *"In the instant case there*

---

* It would be inhuman not to expect inconsistencies in details dealing with minor matters, in testimony covering 10 years and 4 trials; of course such inconsistencies may affect but cannot destroy a witness's testimony.

*can be no misinterpretation of the words purportedly used by Turner. . . ."* The present opinion asserts exactly the opposite. In view of the decision and opinion of this Court in 371 Pa., how is it possible for the majority to justify its present statements or position! This Court, we repeat, was unanimously of the opinion in *Commonwealth v. Turner*, 371 Pa. that the credibility of the two detectives was a matter for the jury; but a majority of the Court reversed the conviction and granted a new trial because the detectives violated an order of sequestration.

From time immemorial it has been the province of the jury to pass upon the credibility of witnesses. When credibility is the sole issue and the testimony of the witnesses on one side is in material respects clear and positive—although denied by the other side—if the jury believed that the witnesses were credible, but the trial Court disbelieved them, the utmost which a trial Court can do is to grant a new trial. Four times the juries and the trial Judges believed these detectives. Yet today the majority of this Court who of course did not see the witnesses, (a) not only disagree with the juries and with the trial Courts as to their credibility,*

---

* The majority base this on (1) the defendants—Turner, Johnson and Lofton—denied they were ever in a cell *together*, and (2) O'Mahoney and Thompson never mentioned the conversation at Turner's first trial in September, 1946 (or at Johnson's or Lofton's first trial), and (3) the detectives were contumacious. Of course, these reasons furnish no support in fact, logic or law for the majority's opinion; it is clear as crystal that they merely raise factual questions for the jury. Each of these arguments could be easily answered. For example, it could as easily and persuasively be argued that the reason they did not testify to overhearing said conversation at said trials was either because they were not asked the question, or because they had far stronger evidence of the defendants' guilt, namely, Turner, Johnson and Lofton had each signed a written confession which was offered in evidence against them, and which—until subsequently invalidated by appellate Courts be-

but (b) arrogate to themselves the power to disbelieve the clear, positive, and in all material respects consistent testimony of witnesses they did not see and to obliterate their testimony which they admit was admissible.

I concur in the grant of a new trial but I vigorously dissent (1) from the conclusion of the Court and (2) from the power and doctrine which for the first time in the history of our Country is claimed, assumed and promulgated by an appellate Court.

Mr. Justice BENJAMIN R. JONES joins in this opinion.

————

CONCURRING OPINION BY MR. JUSTICE MUSMANNO:

I heartily concur in the excellent and illuminating Opinion by Chief Justice JONES and have only one observation to make.

The murder, of which the defendant Aaron Turner was convicted, and which, it is now rather clearly shown, cannot, under accepted standards of proof, be attributed to him, occurred December 15, 1945. The case has thus been in the courts for over 11 years. Turner has had five trials and he was four times convicted and sentenced to death. The fifth trial resulted in a conviction but with sentence fixed at life imprisonment. If he will be acquitted at the next trial or, what appears more probable, he will be discharged because of a *nolle prosequi* resulting from lack of evidence, it

————

cause of having been coercively obtained—proved that each of said men participated in the robbery and were guilty of murder in the first degree. In addition, each signed the confession of the other two, and Lofton pleaded guilty to these murders on January 31, 1947. Lofton, 10 years after pleading guilty to these murders and after all these years in jail, now swears that he and Turner and Johnson never committed or had anything to do with these murders. How gullible can we be?

will be proved that the long fight for his vindication was a worthwhile and justifiable one.

From time to time one reads and hears criticism of American courts because of the lapsed time between the happening of a crime and the final disposition of the criminal charge which follows. The critics invariably point with alarm to our courts and with pride to the English courts, averring that in England a man may be charged with murder and actually hanged on the gallows before we here in America have finished selecting the jury which is to try him. It has always seemed to me that this is a carping criticism.

Without yielding to anyone in my admiration of undoubted excellences in the British system of justice, I still cannot find fault with our determined effort in America to get the right man, and only the right man, before hanging him. I don't doubt that in the long tortuous length of the Turner case, many critics have complained that the attorneys representing him have been "taking advantage" of our courts. Yet, if these attorneys had not possessed the perseverance, and our courts had not been willing to listen, and the pragmatic wisdom of American democracy had not provided the machinery and the opportunity for the continued effort which would result in the ascertainment of the exact truth, an innocent man might probably have gone to an undeserved death.

And now that a eleven-year continuous endeavor for justice has apparently reached the only conclusion it should have reached, I cannot help but express a renewed and continuing admiration for lawyers who, despite rebuffs and seeming failure, carry on, in the tribunals set up by the genius and the fairness of the American people, in the search for the priceless jewel of truth.