378 A.2d 1262

**COMMONWEALTH of Pennsylvania**

v.

**William J. BROWN, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**George L. WILL, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 10, 1976.

Decided Oct. 6, 1977.

William C. Robinson, Butler, for William J. Brown.

Thomas J. Schuchert, Pittsburgh, for George L. Will.

Robert F. Hawk, Assistant District Attorney, and John H. Brydon, District Attorney, Butler, submitted a brief for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

During July and August of 1974 Anderson Asphalt, Inc., was engaged in the performance of a contract to pave a road for PennDOT (Pennsylvania Department of Transportation). Appellant William J. Brown was the owner of a trucking company under contract with Anderson to haul asphalt from Anderson's plant to the job site. The procedure for weighing the trucks was as follows. A truck would be driven under the loading mechanism, and the driver would press a button that released hot asphalt into the bed of the truck. When the driver thought the truck was properly loaded he would (in some manner not quite clear from the record—perhaps by pressing another button) stop the flow of asphalt. The driver would then drive the truck onto Anderson's scale.

Inside the scale house Anderson's weighmaster and the state inspector would independently read the scale and prepare PennDOT weight slips, which were given to the driver. If a truck were overweight, the driver would have to dump some asphalt from it, and it would be re-weighed. Anderson was paid according to the weight of the asphalt delivered to the job site, as recorded on the weight slips, and the drivers were paid an arranged percentage.

On August 1, 1974, appellant George L. Will was Anderson's weighmaster. He was a retired employee—he was 67 years old—and was filling in as weighmaster for three days at the request of his son, George W. Will, who was president of Anderson. A detail of state police arrived at the Anderson plant and stopped six trucks that had just been loaded with asphalt and weighed. Appellant Brown was driving one of the trucks and the others were driven either by his employees or by drivers whose trucks were leased to him. The police had the trucks driven to the Muddy Creek Township scale house, where five of the trucks were unloaded and weighed, and the sixth was weighed as loaded. Then the police had the trucks driven back to the Anderson plant and weighed again. By this procedure the police determined that the weight of asphalt actually loaded onto the trucks was 17.25 tons less than the weight of asphalt indicated on the weight slips prepared by appellant Will. Both appellants Will and Brown were charged with deceptive business practices [1] and with conspiring to commit that offense. [2] Appellant Will was additionally charged with falsification of official records. [3]

At trial the Commonwealth introduced testimony describing the police procedure by which the 17.25 ton discrepancy had been determined. The Commonwealth also introduced

1. Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1, eff. June 6, 1973, 18 Pa. C.S. 4107.

2. Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1, eff. June 6, 1973, 18 Pa. C.S. 903.

3. Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1, eff. June 6, 1973, 18 Pa. C.S. 4911.

testimony of the results of tests made of the paved road. By examining core samples of the surface, engineers calculated how much asphalt had in fact been laid on a particular day. This amount was then compared with the amount shown on the weight slips for that day. This procedure showed that for July 31 the weight slips showed 67.7 more tons as having been delivered than were in fact laid; for August 1, .1 ton more delivered than laid (it will be recalled that for August 1 the police procedure, on which the indictment was based, had shown a discrepancy of 17.25 tons). N.T. 626–643.[4]

George W. Will, president of Anderson, introduced a study he had made of the amount of asphalt laid on August 1. His study showed that Anderson had delivered 6.42 tons more asphalt than shown on the weight slips, *i.e.,* than Anderson had billed the state for. N.T. 414. The defense also called several witnesses who testified that there had been problems with the scale at the Anderson plant. N.T. 441–481. Mitchell Andres, the state inspector, testified that his recorded weights matched those recorded by appellant Will, and that although he had worked right next to appellant Will, he had observed no evidence of any cheating. When asked, "If he's cheating, you would have to be cheating, wouldn't you?", Mr. Andres replied, "That's right." N.T. 336.

The defense also presented evidence regarding the manner in which the Commonwealth had dealt with Anderson. On May 23, 1975, an assistant attorney general wrote a district

4. The record suggests the possibility of an inherent inaccuracy in the weighing procedure. Trucker Ralph Grey was called by the Commonwealth and testified that the most that he had ever known the tare weight (the weight of the empty truck) of his truck to vary was 600 lbs., and that was in winter. N.T. 304. However, it was then established that on the same day, and on the same scale, the tare weight of Mr. Grey's truck had in fact varied by 3,500 lbs. N.T. 312. Apparently, variation in tare weight is generally caused by asphalt that cools and hardens during the truck's run, and therefore sticks to and remains in the bed of the truck on subsequent runs. Contrary to the trial judge's statement in his instructions to the jury, N.T. 700, there was no testimony that the beds of the six trucks had been examined on August 1 to see if they were in fact empty before they were weighed by the state police.

engineer that Anderson should not be paid for the (then still disputed) 17.25 ton discrepancy; the amount thus at issue was $273. N.T. 664. However, the day before, on May 22, the same assistant attorney general wrote Anderson's attorney that "it is the determination of PennDOT that there is not sufficient evidence to warrant a continuance of the suspension of your client, Anderson Asphalt, Inc. As of this date, your client is restored to full status as a bidder and supplier for Commonwealth projects. Due to the lack of evidence regarding alleged shortages, all outstanding invoices are to be paid in full." N.T. 666. Mr. Will, president of Anderson, testified that as a result of this letter he agreed not to sue PennDOT for having wrongfully suspended Anderson. (The suspension had resulted in the loss of the opportunity to bid on contracts for 10,000 to 11,000 tons of asphalt.) N.T. 670.

To prove the conspiracy the Commonwealth introduced the testimony of trucker Ralph Grey, who said that on the evening of July 30 appellant Brown told him to "load light" but that "we'll get paid for a full load." N.T. 289. Mr. Grey said that on July 31 he did try to make his load light but that (as has been discussed above) the trucker has no means of knowing exactly how much asphalt is in his truck until he gets a weight slip. N.T. 290. Mr. Grey also said that on July 29 he had been overweight and had had to dump some asphalt. N.T. 295. In response to this testimony appellant Brown testified that on the instructions of Mr. Will, the president of Anderson, he had told Mr. Grey and other drivers to lighten their loads. He explained the reason as follows:

. . . if there isn't a truck there he either has to dump that two or three ton over the hill and keep on feeding the plant, or set there and wait until the next truck comes in to dump it in, rather than waste the asphalt, and this was the concern of Mr. Will when he told me to lighten up these loads, there was too many trucks had to dump off and come back around, and it was tying up the highlift which fed the plant, and as you heard explained to you,

this is a continuous mix plant. When the plant had to shut down because the bins went empty from the highlift setting with a bucket full of asphalt waiting for the next truck to come, this caused production loss and the whole thing was disturbed, and this was the reason that we were told to lighten, and I told my drivers to lighten up, so they weren't going with heavy loads which had to be dumped all the time.

N.T. 519

The trial lasted from July 21 to July 24, 1975. The jury convicted both appellants Will and Brown on all counts, and they were each sentenced to pay a fine of $2,000 and to serve a term of 3 to 23½ months in prison, to be followed by one year of probation. These appeals followed.

## I

## Appeal of Will

Appellant Will contends that the lower court erred in dismissing his motion to suppress, and that the statutory provisions defining deceptive business practices, 18 Pa.C.S. 4107, are unconstitutional. Because we find that appellant was entitled to a hearing on his motion to suppress we remand for a hearing, and do not reach the constitutional issue.

The grand jury handed down its indictment on June 5, 1975. Appellant was arraigned on June 16. On June 19 appellant filed a motion to suppress and a motion for a continuance.[5] Appellant requested that the date for trial be continued from the scheduled date of June 23 because, among other reasons, the arraignment was held less than ten days before trial in violation of Pa.R.Crim.P. 317(b). The judge granted the motion for a continuance and re-sched-

---

5. Appellant's motion for a continuance is stamped as having been filed on June 19, the motion to suppress is stamped as having been filed on June 24. Presumably the motion to suppress was filed with the hearing judge, who later sent it to the clerk for docketing, for the order granting the motion for a continuance and denying the motion to suppress is dated June 19.

uled the trial for July 21, 1975. The motion to suppress was denied as untimely under Pa.R.Crim.P. 323. Appellant filed a petition for reconsideration of the denial of the motion to suppress, but this too was denied.

■ Pa.R.Crim.P. 323 provides in pertinent part:

(b) Unless the opportunity did not previously exist, or the interests of justice otherwise require, such application shall be made . . . not later than ten days before the day the case is listed for trial.

There is no doubt that when the motion was filed on June 19 it was untimely. Appellant's contention that the opportunity to file it did not previously exist because the arraignment was held less than 10 days before trial is without merit. Where, as here, a defendant has been indicted, there is no need to wait until after the arraignment to file a motion to suppress.

■ However, the rule also provides that a motion should be heard if "the interests of justice" require. It is the responsibility of the hearing judge to decide whether this standard is met. *Commonwealth v. Pinno,* 433 Pa. 1, 248 A.2d 26 (1968). In making his decision, the judge must consider a number of factors and their relationship to each other. "The factors to be considered should include the length and cause of the delay, the merits of the suppression claim, and the court's ability, considering the complexity of the issues and the availability of the witnesses, to hold the hearing promptly." *Commonwealth v. Page,* 246 Pa.Super. 380, 385, 371 A.2d 890, 892 (1977) (dissenting opinion by Spaeth, J.). Thus in *Commonwealth v. Williams,* 229 Pa.Super. 390, 323 A.2d 862 (1974), where counsel made an oral motion to suppress during the trial, we held that it was an abuse of discretion for the trial judge to refuse to hear the motion since on the particular facts of the case, counsel could not as a practical matter have made the motion earlier, and the merits were apparent. The Note to Rule 2001(b), which Rule 323 replaces, stated:

The purpose is to prevent the rule from being used by a delaying defendant who wishes to escape trial or to secure

a continuance. . . . It should also be noted that the court has discretion to entertain the petition within the prohibited time if the justice of the occasion demands it. Rule 2001(b) suspended by Rule 323, effective February 3, 1969.

Here, as has been discussed, on June 19 the lower court continued the date of trial to July 21, or some four weeks away. When the court took this action, the motion to suppress had already been filed.[6] Thus, regarding the facts in a practical manner, the motion was filed considerably more than ten days before trial.

The motion was to suppress any records and statements taken from appellant by the police on August 1, 1974. The motion alleged (and the testimony at trial confirmed) that the police had had no search warrant and had never advised appellant of any of his constitutional rights. So far as we can discern, there would have been absolutely no delay or inconvenience in allowing a hearing on the motion, which on its face presented an arguable claim. Since the trial had already been scheduled for June 23, the Commonwealth and its witnesses were presumably both ready and available. Furthermore, if appellant had been successful and the weight slips had been suppressed, the course of the trial, if the Commonwealth had proceeded to trial at all, would have been substantially altered. In these circumstances the lower court abused its discretion in refusing to hear the motion. Therefore, the judgment of sentence must be vacated, and the case remanded for a hearing on the motion. If the motion is granted, the case should again be listed for trial. If the motion is denied, the judgment of sentence should be reinstated, after which appellant may file an appropriate appeal.

## II

### Appeal of Brown

Appellant Brown contends that the trial judge improperly allowed the prosecutor to plead surprise and cross-examine

6. *See* footnote 5, *supra.*

his own witness, and that this error was compounded by the impermissibly broad scope of the cross-examination.[7]

The district attorney called James Marshall, another truck driver, to the stand. After eliciting some background information, the district attorney asked Mr. Marshall whether on July 31 appellant had given him any specific instructions. Mr. Marshall replied that appellant had told him to "[h]aul light, not to go heavy". N.T. 195. The district attorney asked Mr. Marshall whether he had gone "light", and Mr. Marshall replied: "I have no way of telling, to tell you the truth, sir." N.T. 195. Following some objections, the district attorney again asked: "Did you attempt to go light?", and Mr. Marshall replied: "Like I said, sir, I had no way of knowing because I did not weigh the truck." N.T. 196. The district attorney said that he had no further questions, and cross-examination commenced. Following cross-examination by both defense attorneys (about 12 pages of testimony), the district attorney pleaded surprise and requested that he be allowed to cross-examine Mr. Marshall, assigning as the basis of the request that while Mr. Marshall had testified that he had no way of knowing whether he was "going light", he had previously stated that he knew he was light. The trial judge granted the request.

The rule to be applied in appraising the propriety of the trial judge's decision has been summarized as follows:

The fundamental rule in this jurisdiction is that it is within the sound discretion of the trial court to decide whether counsel may exercise the right of cross-examination of his own witness. *Commonwealth v. Dancer*, 452 Pa. 221, 305 A.2d 364 (1973). In recent years this Court has announced several principles for the trial courts to follow in the exercise of this discretion. First, before counsel may cross-examine his own witness on a plea of surprise the testimony given by the witness must be unexpected. *Commonwealth v. Turner*, 389 Pa. 239, 133 A.2d 187 (1957):

7. Appellant also contends that the evidence of conspiracy was insufficient, and that the trial judge's conduct deprived him of his right to a fair trial, but we find it unnecessary to address these contentions.

" 'Generally, to entitle the party calling the witness to relief from the situation caused by the witness's adverse testimony, it is essential that such party be really surprised by such testimony.' . . . Surprise, in its legal connotation, does not embrace disappointment or a feeling of frustration on part of the one seeking to have a witness testify otherwise than he has indicated he will do." *Id.* 389 Pa. at 253–254, 133 A.2d at 193.

Secondly, the testimony of the witness must be contradictory to statements the witness had made earlier. *Commonwealth v. Bynum,* 454 Pa. 9, 309 A.2d 545 (1973); *Commonwealth v. Tucker,* 452 Pa. 584, 307 A.2d 245 (1973); *Commonwealth v. Dancer,* 452 Pa. 221, 305 A.2d 364 (1973); *Commonwealth v. Stafford,* 450 Pa. 252, 299 A.2d 590 (1973); *Commonwealth v. Knudsen,* 443 Pa. 412, 278 A.2d 881 (1971). Thirdly, the testimony must be hurtful or injurious to the party calling the witness and beneficial to the opposing side. *Commonwealth v. Bynum, supra; Commonwealth v. Tucker, supra; Commonwealth v. Dancer, supra; Commonwealth v. Stafford, supra; Commonwealth v. Knudsen, supra; Commonwealth v. Turner, supra.*

" 'Since the purpose of the cross-examination and impeachment is then, to induce the jury to *disbelieve* the testimony of the witness—there must be something in the witness' testimony, which if not disbelieved by the jury will be hurtful or injurious to the party calling him. Were it otherwise there would be no occasion to discredit or impeach the witness or to stamp him as unworthy of belief.' " *Commonwealth v. Turner,* 389 Pa. at 254, 133 A.2d at 194.

Fourthly, the scope of the cross-examination may not be excessive. *Commonwealth v. Tucker, supra.* The end sought to be achieved by permitting cross-examination of a witness by the party calling him is to allow an opportunity to dispute those unexpected adverse statements made by that witness by showing to the jury that he stated otherwise on a prior occasion. The prior statement is not

admitted as substantive testimony but for the limited purpose of establishing the inconsistency. Thus, where this device is used to introduce additional facts which the witness did not specifically controvert no permissible evidentiary purpose is served and such practice will not be tolerated.

*Commonwealth v. Thomas,* 459 Pa. 371, 379–80, 329 A.2d 277, 280 (1974).

The previous statement by Mr. Marshall was made to a police officer and was as follows: "Marshall advised that he loaded his own truck and he knew he was hauling light because of the distance the paver traveled in laying his loads of material." N.T. 212. This does appear to contradict Mr. Marshall's testimony at trial that he had "no way of telling" whether he had gone light, and it may be assumed that this apparent contradiction really surprised rather than merely disappointed the district attorney. Thus the first two requirements of the rule as enunciated by the Supreme Court were satisfied. However, the third requirement was not satisfied, for the testimony cannot be said to have been injurious to the Commonwealth's case. The testimony did not in any way *tend to prove* a fact *injurious* to the Commonwealth's case; it simply *failed to prove* a fact that *if* proved would have *supported* the case. Therefore, the request for permission to cross-examine Mr. Marshall should not have been granted.

 Furthermore, the error was compounded by the violation of the fourth requirement of the rule, that the scope of the cross-examination must not be excessive, *i.e.,* that it must be limited to establishing the inconsistency between the previous statement and the surprising and injurious testimony. Here the district attorney was permitted over objection of defense counsel, N.T. 223, to continue his cross-examination by introducing testimony from the special investigating grand jury, some of the district attorney's questions being as follows:

Q: All right. I'm going to read you a question and an answer and I want you to listen to this question and

answer and recall if you testified to this. "You knew there was something wrong—this is a question by myself—you knew there was something wrong, you knew when you were being weighed and pulled in there and taking the statements that the ball game was over, you were caught?" Answer, "That morning when we got there I stayed in the truck and slept and everybody got out and talked, and Bill said to the other guy, 'Something is going to happen this morning because there was three State—. . . cop cars when we turned in the asphalt plant.' I didn't know till I got out on the road." Do you recall that question and answer?

N.T. 224–225.

Q: "Once you were pulled over and weighed and the police started to take the statements about light loads, you knew what was going on and you knew you had been ·cheating and you knew you had been caught?" Answer, "Yea, as soon as we walked in the little short fellow from the D.A.'s office said, 'This is all part of the macing deal from Butler County.'"

N.T. 226.

Q: All right. Mr. Marshall, I'm going to ask you a question asked you by Mr. Love, he was a grand juror, one of the people that sat in front of you. You remember, and he asked you this question, "You realized you're making more money because you're getting more tonnage than you are actually hauling, you're getting four and a half ton more on that load then you're actually hauling, and Mr. Brown is making more money because he's paid for the total tons his truck fleet hauled, and the asphalt company would make more money because they are getting paid for asphalt they didn't deliver?" The witness, "Yea." You recall that? You recall stating that?

N.T. 229–230.

This cross-examination was beyond any claim of surprise; it fits precisely within the Supreme Court's admonition that "where this device [of cross-examining one's own witness] is

used to introduce additional facts which the witness did not specifically controvert no permissible evidentiary purpose is served and such practice will not be tolerated." *Id.*

■ Nor can it be maintained that the error was harmless. Such inflammatory phraseology as "you knew you had been cheating" could not have gone unnoticed by the jury, which received no cautionary instructions regarding the supposed limited purpose of this testimony. Other than this testimony, there was only Mr. Grey's statement, denied by appellant, that appellant had told him that he would be paid for a full load despite the light weight.

Probably the most prejudicial aspect of the testimony was the statement quoted by the district attorney that "[t]his is all part of the macing deal from Butler County". N.T. 226. At this point defense counsel moved for a mistrial. The motion was denied, and cautionary instruction was promised, but never given. This "macing deal" was one of the most publicized events in Butler County in 1974, and was before us in *Commonwealth v. Casper,* 249 Pa.Super. 21, 375 A.2d 737 (1977). There we reversed a Butler County conviction and remanded for a change of venue and a new trial, in part because we determined that "there is no doubt that this case received extreme and extensive publicity in Butler County." 249 Pa.Super. at 25, 375 A.2d at 739. It is clear that appellant must be awarded a new trial.

The judgment of sentence at 703 April Term 1976 is vacated and the case is remanded for a hearing on the motion to suppress. If the motion is granted, the case shall again be listed for trial. If the motion is denied, the judgment of sentence shall be reinstated, after which appellant Will may file an appropriate appeal. The judgment of sentence at 692 April Term 1976 is vacated and the case is remanded for a new trial.

HOFFMAN, J., concurs in the result.

PRICE, J., dissents.