375 A.2d 737

**COMMONWEALTH of Pennsylvania**

v.

**William CASPER, Appellant.**

Superior Court of Pennsylvania.

Argued April 13, 1976.

Decided June 29, 1977.

22

David O'Hanesian, Pittsburgh, for appellant.

Robert F. Hawk, Assistant District Attorney, Butler, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE and VAN der VOORT, JJ.

WATKINS, President Judge:

This is an appeal from the Court of Common Pleas of Butler County, Criminal Division, after conviction of the appellant, William Casper, by a jury of twelve counts including seven counts of the practice generally described as "macing", three counts of extortion, and one count each of conspiracy and solicitation. Appellant was sentenced to 1–2 years in prison and fined $11,500.00 for these offenses. This appeal followed.

Several assignments of error are asserted by the appellant in this appeal, but only one need concern us.

The defendant, William Casper, was the chairman of the Democrat Party of Butler County at the time of the alleged offenses. During his trial the Commonwealth produced evidence that the appellant had unlawfully solicited campaign contributions for the Democrat Party from employees of PennDot and from lessors of snow removal equipment with the state. He did this mainly through superintendents of the local PennDot offices. The sum of $120.00 was to be collected from employees who were equipment operators, $60.00 from laborers, and $100.00 per piece of equipment from the lessors. Various coercive measures were used to enforce these contributions such as refusing to approve lessor contracts, transferring employees to less desirable jobs, or giving employees less overtime. Appellant kept a close check on who co-operated and who did not and generally directed the entire operation through the local superintendents.

Prior to trial the appellant filed an Application for a Change of Venue claiming that intense local publicity as to this case had made it impossible for him to receive a fair trial in Butler County. This request was denied by the court below and the defendant proceeded to trial in Butler County. The defendant was convicted on March 6, 1975. The trial had been conducted on five separate days including February 20 and 21, 1975 and March 4, 5, and 6, 1975.

There can be no doubt that the trial of defendant was preceded by many events that cast this entire matter continuously before the public eye. A special grand jury investigation into the alleged "macing" was conducted during the fall of 1974. The testimony of the witnesses at the special investigating grand jury proceedings was reported in copious detail by two local newspapers in Butler County. From May of 1974 up to and including the time of the trial the story of Casper's involvement in the "macing" scheme dominated the news in Butler County. Defendant's picture appeared in the local newspapers several times beside news

stories about the scandal. There were at least 24 stories relative to the scheme in the local newspapers and the defendant's name appeared in print at least 36 times during this period in stories relative to the "macing" scheme. The news stories reported the activities of the special investigating grand jury's proceedings, the testimony adduced during these proceedings, the subsequent indictments returned against the defendant, the activities of a federal probe into PennDot "macing" activities in Butler County, as well as, the arrest of the defendant and the nature of the charges brought against him. In addition, editorials on the matter appeared in print, as well as, letters to the editor on the matter. In light of the above there is no doubt that this case received extreme and extensive publicity in Butler County. The issue here is whether this extensive publicity made it impossible for the defendant to obtain a fair trial in Butler County.

Striking the balance between the right to a fair trial and freedom of the press has long been a complex and troublesome problem. Freedom of thought and discussion and the public's right to know are very important rights in a democratic society. Therefore the news media must be given wide latitude in reporting material about criminal proceedings. *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973). As Justice Eagen held in *Pierce* case, supra:

"A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against miscarriage of justice by subjecting the police, prosecution, and judicial processes to extensive public scrutiny and criticism."

Justice Eagen then went on to say that the Court has been unwilling to place any direct limitations on the freedom traditionally exercised by the news media because what "transpires in the court room is public property". On the other hand the judicial system cannot allow news accounts

to interfere with the administration of justice. Each and every defendant in a criminal prosecution is entitled to a fair trial which is conducted solely in the courtroom and is free of any outside influence. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In *Sheppard,* supra, Mr. Justice Clark noted: "But the Court has also pointed out that 'legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper.'" The jury's verdict must be based on evidence received in open court, not from outside sources. *Marshall v. U. S.,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). Whether pre-trial publicity was of such breadth and scope so as to preclude the possibility of a fair trial in a particular locale is a mixed question of law and fact. As such the trial court exercises wide discretion in deciding whether a change of venue should be granted and its decision should not be reversed unless an abuse of discretion constituting manifest error resulted from this decision. See *Reynolds v. U. S.,* 98 U.S. 145, 25 L.Ed. 244 (1879).

Nevertheless where an accused is denied a fair trial due to extensive pre-trial publicity his conviction must be overturned and a new trial ordered in a different county than the one where he was originally tried.

In *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), Mr. Justice Stewart writing for the majority reversed the conviction of a defendant who was convicted of murder, robbery and kidnapping because prejudicial pre-trial publicity had made it impossible for him to receive a fair trial in the locale where he was tried. In that case a filmed "interview" in which the defendant confessed to the crimes appeared on local television. In reversing the conviction the Court stated that: "For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceeding in a community so pervasively exposed to such a spectacle would be but a hollow formality". The Court took into

consideration the fact that the Parish in which the defendant was tried had a population of approximately 150,000 people and held that such extreme publicity in such a locale made it impossible for Rideau to receive a fair trial in that Parish. The issue of the effect of the publicity on particular jurors was raised but the Court addressed the issue by stating:

"But we do not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from a *community of people who had not seen and heard Rideau's televised 'interview.'*" (Emphasis supplied by opinion writer)

This reasoning is significant because the Court, in deciding that Rideau was entitled to a new trial, held that prejudice to the defendant could be presumed from the extent and nature of the pre-trial publicity in the locale in which the trial took place without delving into the effect of the publicity on particular jurors.

In *Commonwealth v. Pierce,* supra, the court held that the nature of accounts of a street murder released by the police were so inherently prejudicial that the defendant did not have to show a nexus between publicity and actual jury prejudice and therefore did not have the burden of showing identifiable prejudice. In that case the police gave the news media a statement to the effect that the defendant had confessed to the crime. The police also released to the press statements concerning defendant's past criminal record and stories appeared in the local newspapers which informed the public that the defendant had re-enacted the crime for the police. In reversing the defendant's conviction the court stated:

"In the constitutional sense a fair trial necessarily demands the evidence developed against the accused shall come from the witness stand in a public tribunal with the full judicial protection of such rights as: COUNSEL, CROSS–EXAMINATION, CONFRONTATION, and THE

RIGHT AGAINST SELF–INCRIMINATION. These safeguards could not have been afforded the appellant, they were precluded from being fully effective by pre-trial news coverage." (Emphasis supplied)

Following the Supreme Court's reasoning in *Rideau,* supra, our Supreme Court held that the defendant did not have the burden of proving prejudice on the part of any particular juror because the pre-trial publicity was so inherently prejudicial to the accused that he could not obtain a fair trial in the county in which the trial took place. The court went on to admonish the prosecution for its part in creating the prejudicial atmosphere in which the defendant was tried and convicted. The court then enumerated certain guidelines for the prosecution to follow in criminal cases by directing that neither Commonwealth policemen, members of the District Attorney's staff, nor the District Attorney's office itself shall release to the news media: (a) the existence or contents of any statement or confession given by the accused, or his refusal to give a statement or to take tests; (b) prior criminal records of the accused, including arrests and convictions; (c) any inflammatory statements as to the merits of the case, or the character of the accused; (d) the possibility of a plea of guilty; (e) nor shall the authorities deliberately pose the accused for photographs at nor near the scene of the crime, or in photographs which connect him with the scene of the crime. *Commonwealth v. Pierce,* supra. In *Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58 (1971), the court distinguished *Rideau v. Louisiana,* supra, by pointing out that the extensive pre-trial publicity in that case took place in Allegheny County, a community of 1,333,000 people while in *Rideau* the locale affected as a Parish of approximately 150,000. The Court felt that there was much less chance of a defendant being denied a fair trial due to unfavorable pre-trial publicity where the affected area had a larger population thereby diffusing the effects of the publicity. In *Hoss,* therefore, the court affirmed defendant's murder conviction holding inter alia, that the pre-trial publicity though extensive was not so inherently prejudicial as

to make it impossible for the defendant to receive a fair trial in Allegheny County, the affected locale. The Court then went on to examine the effects of the publicity on individual jurors and found that none of them were sufficiently prejudiced against the defendant so as to deny him a fair and impartial trial.

Reading *Rideau, Pierce* and *Hoss* together it is apparent that in deciding whether pre-trial publicity mandates a change of venue in a criminal case we must review not only the extent and nature of the publicity but also the source of the publicity and the nature of the locale which was affected by the publicity if the trial occurred there. In the instant case the trial took place in Butler County which has a population of approximately 128,000 residents. While there is no evidence of any prosecutorial misconduct in the investigation and prosecution of this matter there can be doubt that the sheer volume of news reports about this case created an atmosphere of hostility towards the defendant in this locale. This is so because, unlike the situations in *Rideau, Hoss* and *Pierce* where the defendants were not known to the public prior to the news reports about the crimes with which they were charged, in the instant case the defendant was a well-known local public figure prior to the time of the news reports linking him with the "macing" scheme. Because of this the effect of any news reports about his involvement in criminal activities would be multiplied as members of his community would tend to follow closely the activities of a high ranking local political figure.

Because well-known persons are particularly vulnerable to news stories about alleged wrongdoing on their part especially in smaller communities, we would add to the factors to be considered in determining whether pre-trial publicity had the effect of denying a defendant a fair trial in a particular community another element; namely, the extent to which the public was familiar with the defendant's name prior to the news stories about his involvement in the activities for which he was ultimately tried. By so doing we are recognizing that news reports about a person whose name is familiar

to the general public and who holds high political office are followed more closely than are news reports about strangers, therefore magnifying the effect of such reports. A public figure, especially a public, political figure, is particularly vulnerable to trial by the press before a witness is ever called to testify against him. "This should be especially true when the charges involved are grounded in politics, and by their very nature, invite the glare of publicity that tends to arouse adverse public opinion. We should always abhor trial by newspaper, radio and television". See *Commonwealth v. Evans*, 190 Pa.Super. 179, 154 A.2d 57 (1959) (Dissenting opinion by Watkins, J.)

█ The defendant is clothed with the presumption of innocence until his guilt is proven beyond a reasonable doubt. This county chairman of a local political party was subject to adverse publicity over a long period of time and as the nature of the charges is grounded in politics he was in a position of having the presumption of innocence destroyed before trial, so reducing the burden of proof by the Commonwealth and preventing a fair trial.

In the instant case the news reports of the defendant's "macing" activities were extensive and continuous. Although no stories appeared in print which indicated that the defendant had confessed to the crime or had given any incriminating statements to the police, the testimony of witnesses at the special grand jury proceedings was reported by the press and this testimony did indicate defendant's guilt. Considering the fact that the defendant was a chairman of the Butler County Democrat Committee and that the public's interest in his activities was thereby heightened we believe that his right to a fair and impartial trial in Butler County was jeopardized by the extensive and pervasive pre-trial publicity to which his case was subject. This is especially so because of the nature and size of Butler County, a community of approximately 128,000 residents, where the activities of a local leader of a political party would be followed very closely by members of the community. It should also be noted that although the population of the

county is listed at approximately 128,000 residents, the jury wheel from which the jury was drawn contained much fewer names. Therefore we feel that the situation in the instant case resembles the circumstances in *Rideau* rather than in *Hoss*. As such we are compelled to hold that the defendant is entitled to a new trial in a jurisdiction other than Butler County.

We are mindful of the difficulties involved in insuring that a defendant obtain a fair trial free from adverse pre-trial publicity where the case is one which attracts widespread news coverage and public interest. In the case of a prominent national figure this problem is particularly complex because a situation could conceivably arise where, due to intense national media exposure, it becomes extremely difficult to find any jurisdiction in the country where pre-trial publicity has not had a detrimental effect on the concept of a fair trial. This situation is a result of our modern day, advanced communications system and is one with which courts will be called upon to deal to an increasing degree in the future.

Pennsylvania has sought to deal with the problem by the adoption of Pennsylvania Rule of Criminal Procedure 326 which grants the trial court, inter alia, the right to issue special orders governing such matters as extrajudicial statements by parties and witnesses in cases affected by widespread publicity. While we are not called upon to determine the legality of such so-called "gag orders" in this proceeding the propriety of issuing such orders has been placed in grave doubt by the recent United States Supreme Court decision of *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) where the Court ruled that the Nebraska trial court's order "gagging" the parties, their attorneys, and the press was an unconstitutional violation of the right of free speech because the order was overly broad. No situation is more demonstrative of the clash of the divergent principles of the right to a free press vs. the right to a fair and impartial trial. Because of the limitation now placed upon the judicial machinery in attempting to insure a

fair trial, the only recourse to preserve this right in cases where the right is extremely threatened is to grant a change of venue.

■ Quoting *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) the Court in *Nebraska Press Assoc.,* supra, stated:

" . . . where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should *continue the case* until the threat abates *or transfer it* to another county not so permeated with publicity."

In Pennsylvania our judicial system must contend with the so-called "180 day rule" as promulgated in Rule 1100 of our Pennsylvania Rules of Criminal Procedure. Therefore courts are not inclined to grant continuances readily. For that reason the better procedure is to grant a change of venue where extensive pre-trial publicity makes it unlikely that a defendant can receive a fair trial in a particular county.

In the present case, we are not faced with a situation where the adverse pre-trial publicity was of a national scope. Even the statewide news coverage of defendant's case was not of sufficient nature and scope so as to prejudice him in another Pennsylvania county, somewhat removed from Butler County. Therefore we feel that the defendant's right to a fair trial can be protected by affording him a trial in a Pennsylvania county in another section of the state where a cooler, more deliberate atmosphere can prevail relative to his case.

■ To reiterate, we hold today that in deciding whether the defendant in a criminal case is entitled to a change of venue due to adverse pre-trial publicity the trial court must consider the entire circumstances surrounding the case. In so doing the following elements must be considered:

1.  the extent of the pre-trial publicity;
2.  the nature of the pre-trial publicity;

3. the nature of the community which was subject to the pre-trial publicity and where the trial was scheduled to take place;

4. the source or sources of the pre-trial publicity, including the possibility of prosecutorial misconduct, in creating an atmosphere of hostility toward the accused; and

5. the familiarity of the accused's name with the local populace *prior to* the time when the charges were brought against him for which he is being tried.

While there may be other elements to be considered by the trial court in a particular case wherein a change of venue is sought by the defendant, we hold that the above elements *must* be considered by the trial court in each such case. It is not necessary that all of the above elements be present before a change of venue is mandated in order to insure a fair trial. Any element set forth above or any combination of the above elements may be sufficient to make a change of venue necessary in order to insure that the defendant receives a fair trial. If a review of these elements indicates that the pre-trial publicity is of such magnitude so as to make it impossible for the defendant to receive a fair trial in a particular community then a change of venue must be granted irrespective of what is revealed during the voir dire of the jurors. *Rideau v. Louisiana,* supra; *Commonwealth v. Pierce,* supra. Because we find that the nature and extent of the pre-trial publicity in the instant case was very great, and because the accused was a well-known local public figure *prior to* the news reports of his involvement in the "macing" scheme and because the pre-trial publicity and trial took place in a relatively small community where its effect would be magnified, we hold that the court below abused its discretion in refusing to grant a change of venue.

The case is remanded to the court below with directions that the Petition for Change of Venue be granted and a new trial ordered.

34

SPAETH, J., did not participate in the consideration or decision of this case.

HOFFMAN, J., concurs in the result.

PRICE, J., dissents.