392 A.2d 287

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**William CASPER.**

Supreme Court of Pennsylvania.

Argued March 6, 1978.

Decided Oct. 5, 1978.

144

Robert F. Hawk, Richard W. Given, Asst. Dist. Attys., Butler, for appellant.

David O'Hanesian, Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION

POMEROY, Justice.

In this case we are asked to review an order of the Superior Court holding that the trial court abused its discretion in denying a pre-trial motion for a change of venue. 249 Pa.Super. 21, 375 A.2d 737 (1977). The Superior Court concluded that the pre-trial publicity in the case at bar was "extreme and extensive," 249 Pa. Super. at 24, 375 A.2d at 739, and that the defendant's status as the chairman of a local political party committee, together with the nature of the charges, made a fair trial impossible and required that

prejudice be presumed. The court further held that "the familiarity of the accused's name with the local populace *prior to* the time when the charges were brought against him," 249 Pa. Super. at 33, 375 A.2d at 743, is a factor which must be considered by a trial court whenever presented with a pre-trial motion for change of venue. Because this requirement represented a significant change in our law in this area, we allowed an appeal by the Commonwealth.[1] We conclude that the change announced by the Superior Court is open to serious question and that in any event its decision to order a change of venue in the instant case was without support in the record. Accordingly, we reverse.

## I.

This case had its inception when eight employees of the Pennsylvania Department of Transportation (PennDot) in Butler County reported that they were being forced to make political contributions. An investigation by the state police and the Butler County District Attorney's Office followed, and as a result a criminal complaint was filed on May 16, 1974, charging appellee William Casper with, *inter alia,* numerous counts of demanding political contributions from public employees, an offense commonly known as "macing." Act of April 6, 1939, P.L. 16, § 1, 25 P.S. § 2374 (1963). Appellee, who had been chairman of the Butler County Democratic Committee for some nine years, was indicted on these charges on September 12, 1974. At this time a special grand jury was empaneled to investigate charges related to the original charges against appellee, and on November 29, 1974, the special grand jury made its presentment recommending that additional indictments for crimes of a similar nature be filed against appellee. Indictments were returned by the regular grand jury on December 16, 1974, based on the recommendations of the special grand jury. The Sep-

1. This Court has jurisdiction pursuant to Section 204(a) of the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, 17 P.S. § 211.204(a) (Supp. 1978), since superseded by Section 724(a) of the Judicial Code, 42 Pa. C.S. § 724(a) (effective June 28, 1978).

tember and December indictments were consolidated for trial.[2]

On January 10, 1975, appellee filed an application for a change of venue based on the pre-trial publicity, which motion was denied after hearing on January 24, 1975 by the trial court.[3] Trial commenced on February 18, 1975, and thirty-one counts were submitted to the jury.[4] The jury returned verdicts of acquittal on nineteen counts, and found Casper guilty of seven counts of "macing," three counts of extortion, and one count each of conspiracy and criminal solicitation. Timely post-trial motions were filed and denied, and Casper was sentenced on the extortion convictions to a term of one to two years. He received probation on the other convictions. Total fines imposed were $11,500.

Casper raised several issues in his appeal to the Superior Court, but the court found it necessary to reach only one, viz., whether it was error for the trial court to refuse to grant a pretrial motion for a change of venue. On this point, as noted above, the court held that the motion should have been granted, and ordered a new trial in another county. This appeal followed.

2. Appellee had requested in early October a continuance of the trial of the September indictments, averring that the preliminary hearing transcript was as yet unavailable to counsel, that the indictments had been only recently received by counsel, and that the case had received extensive pre-trial publicity. The motion was granted and the matter continued until January, 1975.

3. In the same order denying the change of venue, the court ordered that all veniremen who had sat as jurors in two previous and somewhat related cases were to be excluded from the jury panel in appellee's trial. An additional continuance was later ordered by the court to the February sessions because it appeared that this exclusion would cause an insufficient number of veniremen to be available for appellee's trial.

4. The evidence at trial basically was that Casper supervised a "macing" and political contribution scheme affecting PennDot employees and lessors of equipment in the Butler County area. Employees who did not contribute the required $60 or $120 were transferred to less desirable jobs or given less overtime. Lessors who did not contribute $100 per piece of equipment leased by them lost their contracts with the state.

## II.

Appellee did not renew his motion for a change of venue at any time during or at the end of the voir dire examination, and it has not been contended at any time that a prejudiced jury was actually empaneled. See *Commonwealth v. Rolison,* 473 Pa. 261, 266–71, 374 A.2d 509, 511–13 (1977) (plurality opinion), citing American Bar Association Standards Relating to Fair Trial & Free Press § 3.4(b), and Commentary (Approved Draft, 1968). Rather he contends, and the Superior Court agreed, that it was an abuse of discretion to deny his change of venue motion filed a little more than a month prior to trial.

██ Our cases make it clear that an application for a change of venue is addressed to the sound discretion of the trial court, and its exercise of discretion will not be disturbed by an appellate court in the absence of an abuse of discretion. *E.g., Commonwealth v. Scott,* 469 Pa. 258, 266, 365 A.2d 140 (1976); *Commonwealth v. Hoss,* 469 Pa. 195, 199, 364 A.2d 1335 (1976); *Commonwealth v. Kichline,* 468 Pa. 265, 273, 361 A.2d 282 (1976); *Commonwealth v. Powell,* 459 Pa. 253, 289, 328 A.2d 507 (1974); *Commonwealth v. Russell,* 459 Pa. 1, 326 A.2d 303 (1974).[5] "In reviewing the trial court's decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pre-trial publicity." *Commonwealth v. Kichline, supra,* 468 Pa. at 274, 361 A.2d at 287. Normally, one who claims that he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the empaneling of the jury. See *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Commonwealth v. Rolison, supra; Commonwealth v. Hoss,*

---

**5.** As Judge Magruder remarked:

"'Abuse of discretion' is a phrase which sounds worse than it really is. All it need mean is that, when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *In re Josephson,* 218 F.2d 174, 182 (1st Cir. 1954).

469 Pa. 195, 201, 364 A.2d 1335 (1976); *Commonwealth v. Pierce,* 451 Pa. 190, 195, 303 A.2d 209, *cert. denied,* 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973). But this rule is subject to an important exception. In certain cases there "can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual jury prejudice," *Commonwealth v. Frazier,* 471 Pa. 121, 127, 369 A.2d 1224, 1227 (1977), because the circumstances make it apparent that there is a substantial likelihood that a fair trial cannot be had. See *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Commonwealth v. Rolison, supra; Commonwealth v. Dobrolenski,* 460 Pa. 630, 334 A.2d 268 (1975), citing American Bar Association Standards Relating to Fair Trial and Free Press § 3.2 (Approved Draft, 1968); *Commonwealth v. Pierce, supra.*[6] It is this exception that we must discuss here.

It is trite but true to note that a presumption of prejudice pursuant to this exception requires the presence of exceptional circumstances. Similarly, generalizations in this area are difficult because "each case must turn on its special facts." *Commonwealth v. Pierce, supra,* 451 Pa. at 198 n.3, 303 A.2d at 213 n.3, quoting *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250, 1252 (1959). Nonetheless, there are certain factors which this Court has identified as relevant to a determination of whether prejudice should be presumed.

It is clear that the mere existence of pre-trial publicity does not warrant a presumption of prejudice. Similarly,

6. There is another class of cases in which prejudice need not be shown, *viz.,* where the activities of the news media cause the trial proceedings themselves to be "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy v. Florida, supra,* 421 U.S. at 799, 95 S.Ct. at 2036, discussing *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). No such situation is asserted to be present in the case at bar.

a possibility that prospective jurors will have formed an opinion based on news accounts will not suffice. A frequently quoted passage in *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), restates these points:

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

See also, *e. g., Commonwealth v. Richardson,* 476 Pa. 571, 578, 383 A.2d 510, 514 (1978); *Commonwealth v. Powell, supra,* 459 Pa. at 260, 328 A.2d at 511; *Commonwealth v. Martinolich,* 456 Pa. 136, 147–48, 318 A.2d 680, 687, *appeal dismissed and cert. denied,* 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974); see generally *United States v. Williams,* 568 F.2d 464, 467–68 (5th Cir. 1978). Moreover, "[e]xtensive pretrial publicity within a county or district does not necessarily preclude a fair trial in that community." *Commonwealth v. Powell, supra,* 459 Pa. at 260–61, 328 A.2d at 510. We instead look to more discrete factors, *viz.,* whether the pre-trial publicity was, on the one hand, factual and objective, or, on the other hand, consisted of sensational, inflammatory and "slanted articles demanding conviction," *United States v. Sawyers,* 423 F.2d 1335, 1343 (4th Cir. 1970);[7]

7. See, e. g., *Commonwealth v. Frazier, supra,* 471 Pa. at 132, 369 A.2d at 1229; *Commonwealth v. Stoltzfus,* 462 Pa. 43, 53, 337 A.2d 873, 878 (1975); *Commonwealth v. Douglas,* 461 Pa. 749, 753, 337

whether the pre-trial publicity revealed the existence of the accused's prior criminal record;[8] whether it referred to confessions, admissions or reenactments of the crime by the defendant;[9] and whether such information is the product of reports by the police and prosecutorial officers.[10] Should any of the above elements be found, the next step of the inquiry is to determine whether such publicity has been so extensive, so sustained and so pervasive that the community must be deemed to have been saturated with it. In this connection the size and character of the area concerned, and more particularly the pervasiveness of the media coverage in the community, warrant consideration.[11]

██ The presence of one of the above elements does not, however, automatically warrant a presumption of prejudice. For example, as we noted in *Commonwealth v. Kichline, supra,* 468 Pa. at 277, 361 A.2d at 288–89, quoting *Commonwealth v. Nahodil,* 462 Pa. 301, 306, 341 A.2d 91, 93 (1975):

> " 'In *Pierce,* we condemned and proscribed the practice of police and law enforcement agents in releasing to the news media the existence and contents of statements or confessions given by those accused of crime. However, a violation of our ruling in *Pierce* does not necessarily mandate a new trial. It must also appear that the news

A.2d 860, 862 (1975); *Commonwealth v. Pierce, supra,* 451 Pa. at 192–93, 303 A.2d at 211.

**8.** See, e. g., *Marshall v. United States, supra; Commonwealth v. Frazier, supra; Commonwealth v. Fortune,* 464 Pa. 367, 346 A.2d 783 (1975); *Commonwealth v. Pierce, supra; Commonwealth v. Allen,* 448 Pa. 177, 292 A.2d 373 (1972).

**9.** See, e. g., *Commonwealth v. Kichline, supra; Commonwealth v. Pierce, supra.*

**10.** See *Commonwealth v. Pierce, supra,* 451 Pa. at 198–200, 303 A.2d at 214–15.

**11.** See *Commonwealth v. Frazier, supra* (local newspaper reached practically every household in the county); *Commonwealth v. Kichline, supra,* 468 Pa. at 274, 361 A.2d at 287 (articles from Berks County newspapers, where case was to be tried, were few and non-inflammatory; articles from newspapers which were published in other counties and which had a limited circulation in Berks County found not to have had a prejudicial effect in Berks County).

accounts were so "inherently prejudicial" that the possibility of a fair trial was questionable.'"

Similarly, we have focused on whether there has been such a "cooling-off period" between the publicity and the commencement of trial that the prejudicial effect of the publicity may be deemed to have dissipated.[12]   The critical factor in the finding of presumptive prejudice, as the above review indicates, is the recent and pervasive presence of "inherently prejudicial" publicity, the likely effect of which is to render a fair trial impossible.  *Commonwealth v. Frazier, supra; Commonwealth v. Kichline, supra; Commonwealth v. Nahodil, supra; Commonwealth v. Powell, supra; Commonwealth v. Russell, supra.*

## III.

█  In the case at bar, the trial court did not enter detailed findings of fact, but noted the following in its opinion denying post-trial motions:

"We refused a change of venue because we determined that the newspaper coverage was fair reporting of matters involved in the investigation and enforcement in this case.  No sensationalism was attached to it, and no one involved as enforcer or prosecutor 'provided prejudicial information.'  In fact, we had concluded that no undue fervor over nor interest in the case had been created.  This was later borne out by the fact that, except for persons involved in the case as parties or as witnesses, very few attended trial as spectators.  This case fits within the requirements of *Commonwealth v. Russell,* [supra, which was the latest appellate authority available

12.   See, e. g., *Commonwealth v. Hoss, supra*, 469 Pa. at 204–05, 364 A.2d at 1340 (five month delay); *Commonwealth v. Kichline, supra*, 468 Pa. at 275–76, 361 A.2d at 288 (six month delay); *Commonwealth v. Nahodil, supra* (six month delay); *Commonwealth v. Stoltzfuz, supra* (one year delay); *Commonwealth v. Douglas, supra* (eleven month delay); *Commonwealth v. Dobrolenski, supra* (five month delay); *Commonwealth v. Powell, supra*, 459 Pa. at 260, 328 A.2d at 511 (1974) (one year delay after homicide and two months after trial of co-felon); *Commonwealth v. Hoss*, 445 Pa. 98, 106, 283 A.2d 58, 63 (1971) (five months between arrest and trial deemed a "lengthy time period").

to the trial court] to sustain the Court's fair exercise of discretion."

The Superior Court, after examining the record, made its own factual findings and arrived at a contrary conclusion, *viz.*, that because the case had received "extreme and extensive publicity," "an atmosphere of hostility towards the defendant in this locale" was to be presumed. 249 Pa.Super. at 29, 375 A.2d at 739, 741. Since the newspaper clippings in the record [13] are critical to the Superior Court's conclusion that the trial court should have granted a change of venue, a review of the factual background and the pre-trial publicity is necessary.

### A.

As noted in part I of this opinion, an investigation began in early 1974 following reports from PennDot employees that they were being forced to make political contributions. On May 16, 1974, the *Butler Eagle*, the major newspaper of the community,[14] reported that 28 "macing" charges had been filed against Casper by the district attorney; Casper's photograph appeared next to the article, which was at the top of the front page. On July 26, 1974, the district attorney petitioned the court for the empaneling of a special investigative grand jury, and the contents of the petition were reported in the *Eagle*. The issuance of subpoenas for

**13.** In support of his argument, appellee has also submitted to this Court, in an appendix to his brief, several newspaper articles not part of the record below. This conduct is disapproved. An appellate court cannot consider facts not of record, *Commonwealth v. Jasper*, 472 Pa. 226, 372 A.2d 395 (1976); *Commonwealth v. Thomas,* 465 Pa. 442, 350 A.2d 847 (1976); *Commonwealth v. Young*, 456 Pa. 102, 317 A.2d 258 (1974), and this settled rule has particular force when the argument that the trial court abused its discretion in refusing a change of venue is based on newspaper articles which were not presented to the trial court. "Such articles must be brought to the court's attention . . . to enable it to make an initial determination as to whether the information is in fact prejudicial." *United States v. Pomponio*, 517 F.2d 460, 463 (4th Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975).

**14.** The *Eagle*, a daily newspaper, has a circulation of 28,397; Butler County's population, as of 1970, was 127,941. [1976–77] Pennsylvania Manual 887, 555.

testimony on the petition (as to which the district attorney refused all comment), was reported on August 20. Testimony was taken on the petition for an investigating grand jury in chambers on August 26, and the contents of the testimony were not reported. The court approved the petition on September 13, and it was reported by the *Eagle* on that day that a special grand jury had not sat in Butler County in almost 20 years. A September 16 article in the *Eagle* reported that the special grand jury had been recessed until September 30 in order to permit Assistant District Attorney Alexander Lindsay additional time to prepare the case. The testimony of a witness at a preliminary hearing on the "macing" charges was reported in two paragraphs in the latter part of the article, apparently as background material. Mr. Lindsay, according to the *Eagle,* "refused to comment on the nature of the testimony to be presented to the panel. He further said, 'There will be nothing public for a long time.' "

The special grand jury's presentments were made public on December 3, 1974; the jury's recommendations for indictments were reported in a single-column story, with which Casper's photograph appeared, on pages 1 and 2 of the *Eagle.* A second story on page 15, occupying about one and one-half columns, summarized the presentments. On the next day, December 4, the *Eagle* reported the court's approval of the recommendations for indictments and its action forwarding the presentments to the December grand jury.

The Superior Court in its opinion for the majority stated that "[t]here were at least 24 stories relative to the scheme in the local newspapers and the defendant's name appeared in print at least 36 times"; that "[d]efendant's picture appeared in the local newspapers several times beside news stories about the scandal"; that "testimony of the witnesses at the special investigating grand jury proceedings was reported in copious detail"; and that news accounts continued from the inception of the investigation "up to and including the time of the trial." 249 Pa.Super. at 24, 375

A.2d at 739. Our independent review of the record has revealed that each of these factual findings is erroneous.

The record contains 15 articles in the *Butler Eagle*; in only 10 of them is Casper's name mentioned, and in only six of these articles is his name mentioned in the first three paragraphs.[15] Casper's photograph appears twice, once in May, 1974, and once on December 3 of that year. None of these articles contains any testimony before the special grand jury. The only mention of pre-trial testimony was the summary of preliminary hearing testimony reported in September, and while the grand jury's presentments were summarized in early December, that summary was "buried" on page 15 of the *Eagle*. Of the six *Eagle* articles in which Casper's name is prominently mentioned, one appeared in May, 1974, one in July, one in September, two on December 3, and one on December 4. The December 4 article, which appeared two and one-half months before trial, is the last news account appearing in the trial record. The Superior Court also laid stress on the presence of "editorials" and "letters to the editor." The record contains one of each, and in neither of them is Casper's name mentioned.[16]

**15.** The Superior Court's error in this regard may have occurred because six of these articles are printed twice in the record. The record also contains three articles from the *Butler County News*, a bi-weekly paper with a circulation of 6,723. [1976–77] Pennsylvania Manual 887. The articles appeared in late August, mid-September, and early November; only in the September article is Casper's name mentioned in the first half of the story. The August article does contain some speculation, based on reports from an anonymous source, that the solicitation of contributions may amount to extortion. But this single article, in which appellee's name is not mentioned and which appeared in a newspaper of limited circulation some five months before trial, hardly warrants a presumption of prejudice. Two brief Associated Press dispatches are also reprinted; neither appears to have come from a Butler County newspaper.

**16.** The letter to the editor, which appeared in the *Eagle* on August 26, expressed support for the district attorney's request for a special investigative grand jury. The editorial, which appeared on September 16, consisted principally of a quotation of Judge Dillon's order empaneling the grand jury and concluded: "The public has a right to expect a full and complete investigation and prosecution of this apparent abuse of public authority, and the special grand jury appears necessary to get it." No expression of sentiment "demanding

158

## B.

The essential predicate of "inherently prejudicial" publicity that may give rise to a presumption of prejudice is simply absent from this record. It is conceded by appellee that there are no accounts of prior criminal record and no articles recounting confessions or reenactments of the offenses by the accused. It is also conceded here, as it was in the Superior Court, that the police and the prosecutorial officers scrupulously adhered to the requirements of *Commonwealth v. Pierce, supra.*[17] The last element that may warrant a finding of "inherently prejudicial" publicity, *viz.*, accounts that "point to the accused's guilt in terms that go beyond objective news reporting and enter the realm of the emotional and of the inflammatory," *Commonwealth v. Frazier, supra*, 471 Pa. at 131–32, 369 A.2d at 1229, is also absent. We cannot accept the proposition that mention of a defendant's name in the lead paragraphs of six newspaper articles which, as the summary above shows, were both separated by ample lapses of time and were factual and summary in nature, warrants the Superior Court's characterization of "extreme and extensive" publicity. Since there is no "inherently prejudicial" publicity present here, we think that no independent significance need be accorded to the extensive circulation of the *Eagle* in Butler County or to the fact that a special grand jury had been empaneled. It is

conviction," *United States v. Sawyers, supra*, appears in either publication.

17. "[W]e rule that in this Commonwealth policemen and members of the staffs of the office of District Attorneys shall not release to the news media: (a) the existence or contents of any statement or confession given by the accused, or his refusal to give a statement or to take tests; (b) prior criminal records of the accused including arrests and convictions; (c) any inflammatory statements as to the merits of the case, or the character of the accused; (d) the possibility of a plea of guilty; (e) nor shall the authorities deliberately pose the accused for photographs at or near the scene of the crime, or in photographs which connect him with the scene of the crime." 451 Pa. at 200, 303 A.2d at 215. See Pa.Code of Professional Responsibility, Disciplinary Rule 7–107; ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, §§ 1.1, 2.1 (1968).

saturation with "inherently prejudicial" publicity, and not the possibility of saturation alone, that is important since, as we have noted, "[e]xtensive pretrial publicity . . . does not necessarily preclude a fair trial." *Commonwealth v. Powell, supra,* 459 Pa. at 260, 328 A.2d at 510. *Accord, e. g., Gordon v. United States,* 438 F.2d 858, 874 (5th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971). And the gap of two and one-half months between the close of the publicity and the trial in the instant case, which might or might not serve to dispel the effects of "inherently prejudicial" publicity in other cases, serves here to make even more plain the want of basis for a presumption of prejudice, since here there was no such publicity.

Further confirmation of the Superior Court's mistake in presuming prejudice in the case at bar is provided by the transcript of the voir dire proceeding—a portion of the record the Superior Court did not find it necessary to examine. The twelve jurors and the two alternates in this case were chosen from 42 veniremen. Of these, 15, or only about one-third, had *any* knowledge of the case from news accounts or by word of mouth. Two of these persons indicated that they would have difficulty in deciding the case solely on the basis of the evidence presented at trial and were dismissed for cause. The other thirteen had a vague recollection of the accounts [18] and not one of these prospective jurors stated that he had formed any opinion concerning Casper's guilt or innocence. Only three of these thirteen persons were empaneled, one as an alternate who was later excused.[19] In sum, we are satisfied that there is nothing in

18. *E. g.,* "Well, really, I can't say I paid that much attention to it. I scan the paper when I get home from work"; "I read a little bit. I can't recall anything"; "I don't know much about it"; "Not in detail, no."

19. Compare *Commonwealth v. Frazier, supra,* 471 Pa. at 130–31, 369 A.2d at 1229 (28 of 32 prospective jurors know of case from news accounts; 11 challenged for cause on grounds of fixed opinion or recollection of prior criminal record of accused; change of venue ordered); *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975), *cert. denied,* 428 U.S. 923, 96 S.Ct. 3234, 19 L.Ed.2d 1226 (1976) (97 of 107 veniremen knew of case; 23 of 221 veniremen

this record warranting a conclusion that the pre-trial publicity here made it highly unlikely that a "panel of impartial, 'indifferent' jurors," *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), could be chosen from the Butler County community.

## IV.

The Superior Court also found an additional element present here which it believed warranted a presumption of prejudice. It found that appellee was a well-known political figure in the community, and reasoned that this status, together with the nature of the offenses alleged, presented a grave danger to the likelihood of a fair trial.[20] Again, we

professed fixed opinion and excused for cause; no prejudice shown); *Commonwealth v. Hoss*, 445 Pa. 98, 106, 283 A.2d 58, 63 (1971) (26 of 138 prospective jurors had fixed opinion and were excused for cause; no prejudice shown).

**20.** The court expressed this view as follows:

"Because well-known persons are particularly vulnerable to news stories about alleged wrongdoing on their part especially in smaller communities, we would add to the factors to be considered in determining whether pre-trial publicity had the effect of denying a defendant a fair trial in a particular community another element; namely, the extent to which the public was familiar with the defendant's name prior to the news stories about his involvement in the activities for which he was ultimately tried. By so doing we are recognizing that news reports about a person whose name is familiar to the general public and who holds high political office are followed more closely than are news reports about strangers, therefore magnifying the effect of such reports. A public figure, especially a public, political figure, is particularly vulnerable to trial by the press before a witness is ever called to testify against him. 'This should be especially true when the charges involved are grounded in politics, and by their very nature, invite the glare of publicity that tends to arouse adverse public opinion. We should always abhor trial by newspaper, radio and television'. See *Commonwealth v. Evans*, 190 Pa.Super. 179, 154 A.2d 57 (1959) (Dissenting opinion by Watkins, J.)

"The defendant is clothed with the presumption of innocence until his guilt is proven beyond a reasonable doubt. This county chairman of a local political party was subject to adverse publicity over a long period of time and as the nature of the charges is grounded in politics he was in a position of having the presumption of innocence destroyed before trial, so reducing the burden of proof by the Commonwealth and preventing a fair trial." 249 Pa.Super. at 29, 375 A.2d at 741–42.

disagree. We think that the Superior Court engaged in an exercise of judicial notice unwarranted by the record in this case, and that its "public figure" element in ascertaining whether prejudice should be presumed should not now be adopted as part of our law.

We deal first with the finding that appellee was well-known. Nothing in the record was mentioned by the court in support of this conclusion, and there is no suggestion of appellee's supposed prominence in the trial court's opinion. Thus we deal with an exercise of judicial notice by an appellate court. Rule 201(b) of the Federal Rules of Evidence, which is in accord with Pennsylvania law,[21] provides: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." We think it plain that neither the Superior Court nor this Court is in a position to assert that it is so familiar with conditions in Butler County as to be certain, contrary to the conclusion of the trial court, that Casper was prominent in the community, or that local political party chairmen generally are well-known in the Commonwealth. Once again, the voir dire transcript is instructive. All 42 prospective jurors were asked whether they were related to or acquainted with Casper. One person stated that she knew appellee from her work on a local party committee, and was excused; three others said that they "knew of" him. None of these persons sat on the jury.[22]

Next to be considered is the "public figure" element in the Superior Court's opinion. The difficulty of knowing,

---

**21.** See, e. g., *Emert v. Larami Corp.*, 414 Pa. 396, 397 n.1, 200 A.2d 901 (1964); *Commonwealth v. Brose*, 412 Pa. 276, 194 A.2d 322 (1963); *Clouser v. Shamokin Packing Co.*, 240 Pa.Super. 268, 361 A.2d 836 (1976).

**22.** It is also of interest that no more than four people stated that they knew of Casper's co-defendant, a former state legislator from Butler County. A slightly larger number had heard of the district attorney.

with any reasonable degree of certainty, precisely how well a person is known in the community is one reason why we have difficulty with a "public figure" element giving rise to a presumption of prejudice. Moreover, "[w]e cannot accept the position that 'prominence brings prejudice.'" *Hale v. United States*, 435 F.2d 737, 747 (5th Cir. 1970), *cert. denied*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971) (trial of bank president for various "white-collar" crimes). Indeed, a defendant enjoying prominence in the community might well view his status as an advantage. On the whole, we think that this additional element is entirely too amorphous and subject to speculation to be added as a basis for a pretrial presumption of prejudice in any but the most truly extraordinary cases:

> "'The voir dire examination is the proper place to determine whether a defendant's public notoriety has resulted in a prospective juror's prejudice.' *United States v. Hoffa*, 367 F.2d 698 (7th Cir. 1966), vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). This is the normal rule and practice in Pennsylvania. *Commonwealth v. Jones*, 452 Pa. 299, 304 A.2d 684 (1973). *Commonwealth v. McGrew*, 375 Pa. 518, 525, 100 A.2d 467, 470 (1953)." *Commonwealth v. Martin*, 465 Pa. 134, 149, 348 A.2d 391, 398 (1975) (plurality opinion), *cert. denied*, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976).

Cf. *Commonwealth v. Hoss*, 469 Pa. 195, 364 A.2d 1335 (1976).[23]

Moreover, the nature of the charges, the appellant's position as a party official, and the fact that this trial occurred some six months after the climax of the Watergate scandal do not affect our conclusion that prejudice should not have been presumed. The opinion of the court which

**23.** Should there be some likelihood that one's prior prominence in the community may add to the public interest in the charges against him, the allowance of continuances and the careful fashioning of voir dire procedures and questions may well prove useful in the selection of an impartial jury. The record reflects such action by the trial court here.

had to deal directly with the effect of pre-trial publicity on the Watergate prosecutions—the United States Court of Appeals for the District of Columbia Circuit—is pertinent here:

"A judge reviewing pretrial publicity before the *voir dire* would have to attempt to determine from his own reactions how the community would respond to that publicity. The subjective nature of this determination is well illustrated by the arguments in the briefs. The Government maintains that since '[t]he offenses charged here were not crimes of violence and passion,' but rather legally complex white collar crimes, pretrial publicity would make little impression on most citizens. Br. for the United States (hereinafter Govt. br.) at 76–77. Haldeman, on the other hand, maintains that the publicity was such as to arouse strong personal feelings in all who came in contact with it:

> Each citizen and thus each prospective juror was led to believe that his security and way of life was [sic] personally threatened by what these appellants had done. There could be no sympathy for them. The publicity was calculated to inspire the jurors with a high sense of duty involving much more significant issues than bringing some petty criminal to justice. They were made to feel that they were patriots repelling an attack on their country by an enemy within the gates.

Haldeman reply br. at 12. After the *voir dire* a judge can determine which description of the publicity's impact is accurate; before the *voir dire* a judge could only have guessed.

"Our own reading of the 2,000-page *voir dire* demonstrates that the Government's assessment of the public's interest in Watergate matters is correct. Most of the venire simply did not pay an inordinate amount of attention to Watergate. This may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which interest them may be less fascinating to

the public generally." *United States v. Haldeman*, 181 U.S.App.D.C. 254, 285, 559 F.2d 31, 62 n.37 (1976) (en banc), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

As we have indicated above, the voir dire transcript in the case at bar leads us to the same conclusion. We think that it would be quite unwarranted to presume, as a matter of judicial notice, that potential jurors in a case involving political corruption will necessarily assume that, since all political figures are inherently dishonest, the defendant must be guilty. Nor in a case involving political or governmental corruption should a greater degree of protection be created for a political party official than is accorded any other accused person. We should not assume that the average citizen called as a juror is unable to lay aside any preconceived notions about politics in general which he might have when he enters the jury box and swears to decide the case solely on the basis of the law and the evidence presented at trial. To do so is to express a lack of confidence in our jury system, which, for all its imperfections, has shown itself to be worthy of our trust.

The order of the Superior Court is reversed, and the case is remanded to that court for consideration of appellee's other assignments of error.

NIX and MANDERINO, JJ., would grant a new trial for the reasons set forth in the opinion of the Superior Court, 249 Pa.Super. 21, 375 A.2d 737 (1977).